UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

ANNETTE HARDING,
         Plaintiff

v.

BOSTON METRO PUBLISHING,
         Defendant

---

Civil Action No. _____

## 05  10576 GAO

MAGISTRATE JUDGE _____

### NOTICE OF REMOVAL

TO THE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF MASSACHUSETTS:

PLEASE TAKE NOTICE the Defendant, Boston Metro Publishing ("Boston Metro"),

hereby serves notice of removal of the above-entitled action to this Court and makes the

following showing in support of such removal:

### PLEADINGS AND PROCEEDINGS TO DATE

1.    On or about February 16, 2005, an action was commenced in Suffolk Superior

Court of the Commonwealth of Massachusetts, entitled Annette Harding v. Boston Metro

Publishing, Civil Action No. 05-0617G, by the filing of a Summons and Complaint, copies of

which are attached hereto as Exhibit A.

2.    Defendant was served with a copy of said Complaint on February 24, 2005 by

service upon its registered agent for service.  The foregoing Summons and Complaint and the

Civil Action Cover Sheet constitute all the process, pleadings, and orders received by the

Defendant to date.  No further proceedings have occurred in the state action.

3.    This Court has original jurisdiction of this action because it involves a claim (Count 5) under a pension plan that is an employee benefit plan regulated by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), Sections 3(2), 3(3), 4(a), 29 U.S.C. §§ 1002(2), 1002(3), and 1003(a).  Specifically, this action involves either a claim of denial of benefits under a pension plan under  Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), or a claim of alleged failures or omissions in the administration of a pension plan under Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3).

### ERISA/FEDERAL QUESTION REMOVAL

4.    This Court has original jurisdiction of claims under Section 502(a) of ERISA, 29 U.S.C. § 1132(a), under the provisions of Section 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1), 28 U.S.C. § 1331 and 29 U.S.C. § 1441(b), in that Plaintiff here either  claims entitlement to benefits or claims the occurrence of  a breach of fiduciary duty under an employee pension plan, within the meaning of Section 3(2) of ERISA, 29 U.S.C. § 1002(2), covered by ERISA, Section 4 of ERISA, 29 U.S.C. Section 1003.  Civil enforcement rights under employee pension plans are governed by ERISA, and with inapplicable exception, the provisions of ERISA completely supersede and preempt any and all state laws to the extent that they relate to plans regulated by ERISA.  Section 514(a) of ERISA, 29 U.S.C. § 1144(a).

5.    Because the United States District Courts have original jurisdiction over, and federal law controls, actions brought to redress alleged denials of benefits and/or alleged acts regarding omissions in plan administration or mishandling of administrative functions under employee pension plans, Section 502(a), (e) of ERISA, 29 U.S.C. § 1132(a), (e), removal of this case to this Court under the circumstances herein is proper.  Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58 (1987).

-2-

9.    Defendant is providing notice to the Suffolk Superior Court and Plaintiff of this Notice of Removal in the form attached hereto as Exhibit B.

WHEREFORE, Defendant prays that the above action pending against it in Suffolk Superior Court, Commonwealth of Massachusetts Civil Action No. 05-0617G, be removed therefrom to this Court.

Respectfully submitted,

BOSTON METRO PUBLISHING
By its attorneys,

Thomas Royall Smith, BBO #470300
Erik J. Winton, BBO #600743
Jackson Lewis LLP
75 Park Plaza
Boston, MA 02116
(617) 367-0025

Dated:    March 24, 2005

## CERTIFICATE OF SERVICE

This hereby certifies that on this 24th day of March, 2005, a copy of the foregoing was served upon Plaintiff's counsel, Gordon W. Spencer, Esq., 1256 Park Street, Suite 104, Stoughton, MA, via first-class mail, postage prepaid.

Jackson Lewis LLP

-3-

# Commonwealth of Massachusetts

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION

No. 05-0617 G

_____ Annette Harding _____ , Plaintiff(s)

v.

_____ Boston Metro Publishing _____ , Defendant(s)

## SUMMONS

NOTICE TO DEFENDANT — You need not appear personally in court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein and also file the original in the Clerk's Office.

To the above-named Defendant:

You are hereby ~~summoned and required~~ to serve upon _____ Attorney _____ Gordon W. Spencer _____

plaintiff's attorney, whose address is 125½ Park Street #104 Stoughton, MA an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at Boston either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13 (a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter ~~be barred from~~ making such claim in any other action.

Witness, **Barbara J. Rouse** ~~o~~, Esquire, at Boston, the _____ sixteenth _____ day of _____ February _____ , in the year of our Lord two thousand _____ five _____ .

*Michael Joseph Donovan*

Clerk/Magistrate

A true copy Attest:

Deputy Sheriff Suffolk County

NOTES.

1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.

2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.

3. TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED
   (1) TORT — (2) MOTOR VEHICLE TORT — (3) CONTRACT — (4) EQUITABLE RELIEF — (5) OTHER

FORM CIV.P. 1 3rd Rev.

| CIVIL ACTION COVER SHEET | DOCKET NO(S) 05-0682 G | Trial Court of Massachusetts Superior Court Department County: Suffolk |
|---|---|---|

PLAINTIFF(S) _Annet  Harding_

DEFENDANT(S) _Prairie Motor Billerbeay_

ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE
_Gordon W. Spencer_
_1256 Park St. Suite 101_
_Stoughton, MA 02072_
Board of Bar Overseers number: _630488_

ATTORNEY (if known)
_Bob Bortolie_
_Prairie Legal Glassberg & Tye_

## Origin code and track designation

Place an x in one box only:
- [x] 1. F01 Original Complaint
- [ ] 2. F02 Removal to Sup Ct. C 231.s 104 (Before trial) (F)
- [ ] 3. F03 Retransfer to Sup Ct. C 231,s 102C (X)
- [ ] 4. F04 District Court Appeal c 231. s 97 & 104 (After trial) (X)
- [ ] 5. F05 Reactivated after rescript; relief from judgment/Order (Mass R.Civ P. 60) (X)
- [ ] 6. E10 Summary Process Appeal (X)

## TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)

CODE NO. _B-22_   TYPE OF ACTION (specify) _Employment Disc._   TRACK _(F)_   IS THIS A JURY CASE? _( ✓ ) Yes   ( ) No_

The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

### TORT CLAIMS
(Attach additional sheets as necessary)

A. Documented medical expenses to date
1. Total hospital expenses
2. Total Doctor expenses
3. Total chiropractic expenses
4. Total physical therapy expenses
5. Total other expenses (describe)

Subtotal

B. Documented lost wages and compensation to date
C. Documented property damages to date
D. Reasonably anticipated future medical and hospital expenses
E. Reasonably anticipated lost wages
F. Other documented items of damages (describe)   _emotional distress  etc_  $50,000

G. Brief description of plaintiff's injury, including nature and extent of injury (describe)
_Suffered lost wages  emotional distress_
_for wrongful discharge based upon race, adverse employment_
_actions based upon disparate treatment based upon race._   TOTAL $ _75,136._

### CONTRACT CLAIMS
(Attach additional sheets as necessary)

Provide a detailed description of claim(s):
_See above in lost wages + commissions_

TOTAL $ . . . . . . . . .

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."

Signature of Attorney of Record _____   DATE: _2/16/05_

AOTC-6 mtc005-11/99
A.O.S.C. 1-2000

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss                                    SUFFOLK SUPERIOR COURT
                                                      C.A. NO. 05-

                                              05-0617 G

| | |
|---|---|
| ANNETTE HARDING, | ) |
| Plaintiff. | ) |
| v. | ) |
| | ) |
| BOSTON METRO PUBLISHING | ) |
| Defendant. | ) |
| | ) |
| | ) |

**VERIFIED COMPLAINT**

## I.       PARTIES

1.   Plaintiff is a black female citizen of the United States living at 9 Edwin St #2,

     Boston, County of Suffolk, Massachusetts.

2.   Boston Metro Publishing is a corporation duly organized and doing business under

     the laws of the Commonwealth of Massachusetts. Defendant maintains a place of

     business at 320 Congress Street, Boston, County of Suffolk, Massachusetts.

## II.      FACTUAL ALLEGATIONS

3.   The Defendant's business consists of publishing and distributing the

     5- day-a week newspaper, *Boston Metro*.  The newspaper is distributed free of

     charge, and contains relatively short articles encapsulating the news of the day and

     is designed to be read quickly by commuters.  The length of each day's issue is

     strictly limited to 40 pages, of which no more than 50 percent is advertising, which

     accounts for 100% of the company's total revenue.

4.   The ads are sold on the basis of size, with the larger ads priced higher than the smaller ones.

5.   The ads could also be categorized into "display ads" and "classified ads". Display ads are much larger than classified ads, and would generate more revenue than its smaller counterpart.

6.   The Plaintiff was hired under a contract at-will by the Defendant, to start work on April 3 2002, as a telesales representative, in the Defendant's sales department.

7.   One of the responsibilities of a telesales representative was to solicit advertising space within the Defendant's newspaper.

8.   On the same day of April 3, 2002, the Defendant and Plaintiff entered into a written agreement (hereinafter "the agreement") which outlined the terms and conditions of her at-will employment with the Defendant.

9.   More specifically, the agreement stated that Plaintiff's specific responsibilities were to include making sales calls to prospects across all categories with a minimum of twenty-five calls per day, tracking advertising orders into the computer system, report status and outcome to the sales, and to perform such other duties as the Defendant may assign.

10.  At the time of her hire, the Defendant promised the Plaintiff, as stated in the agreement, that in exchange for her employment with the company, she would get paid 26 thousand dollars per annum, plus a 10% commission on all "collected sales", (hereinafter, "cash-in" sales), if said amount exceeded $17,110.00 (9% commission if said amount did not exceed $17,110.00), and a 15% commission on revenue sales over $25,000.00 per month.

11.  The agreement also contained an implied covenant of good faith and fair dealing, that Plaintiff would not be terminated in order to avoid Defendant's obligation in paying the Plaintiff commissions that she earned, or almost earned, through services that she already rendered to the Defendant.

12.  The Defendant also admits that Plaintiff would not be terminated in order to avoid its obligation to pay the Plaintiff commission that she earned, through services that she already rendered to the Defendant.

13.  The Defendant further admits that Plaintiff would not be terminated in order to avoid its obligation to pay the Plaintiff commission that she almost earned, through services that she already rendered to the Defendant.

14.  The agreement also was silent as to Plaintiff's entitlement to any commission on sales generated by the Plaintiff, but "collected" by the Defendant, after the Plaintiff's employment with the Defendant had ceased.

15.  Defendant also promised Plaintiff that she would accrue vacation time at a rate of .4 days a month, and that in exchange for her employment with the company, she would be entitled to receive all unused vacation time, once her employment with the Defendant had ceased.

16.  At the beginning of her employment with the Defendant, Plaintiff was assigned to sell display ads. The Plaintiff excelled at her position.

17.  After the passage of time, however, and in spite of Plaintiff's superior job performance in selling display ads, Defendant altered Plaintiff's job responsibilities within the sales department to selling mostly classified ads.

18.  Even though the Plaintiff's job responsibilities were modified, the Plaintiff still remained a sales representative within the Defendant's company, and the Plaintiff

3

was still authorized to sell display ads for the Defendant. The Defendant merely instructed the Plaintiff to devote more time to selling classified ads.

19. Classifieds were billed at a flat rate of $29.00 per ad, a significantly lesser amount than the cost of display ads, and did not provide much opportunity to maximize the potential for lucrative commissions.

20. The Plaintiff interpreted the Defendant's modification in her job responsibility as a demotion, as she now had to work much harder in order to obtain commissions commensurate with what she had received selling mostly display ads.

21. Notwithstanding the modification in job responsibility, however, Plaintiff was committed to a long-term relationship with Defendant, was seeking to maintain employment within the Defendant's sales department indefinitely

22. Once the Defendant modified the Plaintiff's job responsibilities, by instructing her to devote more of her time selling classified ads, Plaintiff performed her job in selling classified ads with diligence and superiority.

23. Plaintiff would usually sell the classified ads via the telephone, where the client would routinely pay the price of the advertising space via a credit card.

24. Plaintiff avers that as soon as the client would pay the price of the advertising space via a credit card, the transaction would be considered "cash-in", entitling her to a commission on that transaction.

25. Defendant also admits that as soon as the client would pay the price of the advertising space via a credit card, said transaction would be considered "cash-in", entitling the sales representative to a commission on that transaction

26. Defendant admits that their policy of entitling their sales representatives to a commission on advertising space paid by credit card was carried out in practice, as

Plaintiff would promptly receive commissions on sales of advertising space paid by credit card.

27. Defendant admits that their policy of entitling their sales representatives to a commission on advertising space paid by credit card was promised to the Plaintiff in exchange for her employment.

28. Defendant has a policy by which it binds itself to observe fair employment practices, and pledges not to discriminate against its employees in the terms and conditions of employment on account of race, color, and national origin.

29. The terms and provisions of the policy defined in paragraph 28 have become part of the terms of the contract of employment between Plaintiff and Defendant, and Plaintiff relied on such terms during her employment with Defendant.

30. Employees of color, such as Plaintiff, were the intended beneficiaries of the provisions of the Defendant's policy delineated in Paragraph 28.

31. At the time of Plaintiff's hire, the Defendant was aware of Plaintiff's prior work history in sales and advertising.

32. At the time of Plaintiff's hire, the Defendant knew that from 1996 to 2001, Plaintiff was employed by the Community Newspaper Company in Needham, MA, a company owned by the Boston Herald

33. Defendant's knowledge of Plaintiff's previous employment with Community Newspaper Company also included that Plaintiff's initial job title was, "classified advertising sales representative", whereafter she was promoted to, "recruitment display advertising sales representative" within that company.

34.   Defendant was also aware at the time they hired Plaintiff that she had marketing and public relations experience while working for Community Newspaper Company.

35.   On or about November of 2002, Ms. Peggy Onstad joined the Defendant's company (Boston Metro) as its Vice President of Sales, Marketing and Promotions.

36.   Soon after Onstad's arrival, the Plaintiff began experiencing what she characterizes as a "racist atmosphere" within the work place, demonstrated specifically by the Defendant's disparate treatment of her, via the Defendant's implementation of its corporate policy.

37.   Defendant had a policy of giving sales representatives within the company opportunities to generate additional income for themselves via monetary incentive contests, called "spiffs".

38.   More specifically, Defendant, via Ms. Onstad, had devised and implemented sales incentive contests called "spiffs", designed to motivate sales representatives to boost their revenues, with a monetary reward (bonus) to the sales representative who wins the contest

39.   The Defendant's policy however, provided no guidelines to ensure that all sales representatives would be given the same opportunity to participate in the bonus incentive contests without bias or prejudice.

40.   The failure of the Defendant to promulgate written, objective guidelines in the administration of the bonus incentive contests was an invitation to engage in racial discrimination against employees of color under the guise of exercise of managerial discretion or prerogative.

41. The failure of the Defendant to promulgate guidelines for such a situation, permitted of subjective decision-making, infected with the taint of racial prejudice on the part of personnel employed by the Defendant.

42. An example of such a contest would be that the Defendant, would give money to sales representatives who obtained the "largest single order for any particular month".

43. Another example of such a contest would be that the Defendant, would give money to sales representatives who obtained the "greatest amount of revenue" for any particular month.

44. Another example of such a contest would be that the Defendant would give money to sales representatives who obtained the "greatest number of ads ordered for any particular month".

45. On or about May of 2003, Plaintiff began to notice that the Defendant's bonus system, specifically implemented by Peggy Onstad, denied her opportunities that were being afforded to Caucasian sales representatives.

46. At this time (May of 2003) there were approximately 13 sales representatives employed with Defendant, and three of them were specifically assigned to "telesales". All three of the telesales representatives were not of Caucasian descent, including the Plaintiff.

47. In light of Plaintiff's relegation to classified ads, taking into consideration the characteristics of the classified ad, she was not able to take advantage of the opportunity to obtain the "largest single order for any particular month", as sales in classified ads would not generate enough revenue to become the "largest single order for any particular month".

7

48.  In light of Plaintiff's relegation to classified ads, taking into consideration the characteristics of the classified ad, she was not be able to take advantage of the opportunity to obtain the "greatest amount of revenue" for any particular month, as the minuscule revenue generated in classified sales put her at a distinct disadvantage in comparison to other sales representatives who sold display ads.

49.  The failure of the Defendant to promulgate written, objective guidelines before the drafting and administration of the bonus incentive contests was an invitation by Peggy Onstad to engage in racial discrimination against employees of color under the guise of exercise of managerial discretion or prerogative.

50   The failure of the Defendant to promulgate written, objective guidelines in the drafting and administration of the bonus incentive contests did allow Peggy Onstad to discriminate against the Plaintiff by denying her the opportunity to fairly compete in the bonus incentive contests

51.  The failure of the Defendant to promulgate written, objective guidelines in the drafting of the bonus incentive contests, coupled with Peggy Onstad's biased administration of the bonus incentive contests, had an adverse impact upon the Plaintiff.

52.  The Plaintiff was impacted adversely because she was denied opportunities to make additional income, via the Onstad "spiff" system, that were afforded her Caucasian counterparts.

53.  There were other instances where the Defendant's implementation, and/or ratification of corporate policy, reflected the racist atmosphere within the company, and which treated the Plaintiff disparately in comparison to the Caucasian sales representatives that worked for the Defendant.

8

54.    For example, at unspecified times during the day, it was not unusual for unsolicited
       prospects/clientele to call the Defendant, (hereinafter, "call-ins") seeking to
       purchase advertising space within the Defendant's newspaper.

55.    In the event of a call-in, Defendant had a policy, implemented by its managerial
       employees, Ms. Peggy Onstad, and Mr. John Watts, whereby it provided for all
       call-ins to be distributed to all of its sales representatives.

56.    The Defendant's policy however, provided no guidelines to ensure that all sales
       representatives would be given the same opportunity to receive call-ins without bias
       or prejudice.

57.    The failure of the Defendant to promulgate written, objective guidelines when
       distributing the call-ins that came into the office was an invitation to engage in
       racial discrimination against employees of color under the guise of exercise of
       managerial discretion or prerogative.

58.    The failure of the Defendant to promulgate guidelines for such a situation.
       permitted of subjective decision-making, infected with the taint of racial prejudice
       on the part of personnel employed by the Defendant.

59.    The failure of the Defendant to promulgate guidelines in the distribution of the call-
       ins, allowed Ms. Peggy Onstad, and Mr. John Watts, to specifically employ
       subjective decision-making, infected with the taint of racial prejudice, when
       engaged in the distribution of call-ins on behalf of the Defendant.

60.    Ms. Peggy Onstad did not give Plaintiff the same opportunity to receive call-ins as
       she gave to Caucasian sales representatives employed within the company.

61.    Mr. John Watts did not give Plaintiff the same opportunity to receive call-ins as he
       gave to Caucasian sales representatives employed within the company.

62. Ms. Peggy Onstad did not ensure that Plaintiff would receive call-ins for display ads, that would routinely come in over the Defendant's phone lines, rather routing the call-ins to Caucasian sales representatives.

63. Mr. John Watts did not ensure that Plaintiff would receive call-ins for display ads, that would routinely come in over the Defendant's phone lines, rather routing the call-ins to Caucasian sales representatives.

64. Ms. Onstad's actions, as it pertained to the implementation of Defendant's policy regarding the distribution of call-ins caused Plaintiff to experience racial discrimination and prejudice, because although Plaintiff was a sales representative within the company throughout her employment, Ms. Onstad distributed a majority or disproportionate amount of the call-ins for display ads to Caucasian sales representatives

65. Mr. John Watts' actions, as it pertained to the implementation of Defendant's policy regarding the distribution of call-ins, caused Plaintiff to experience racial discrimination and prejudice, because although Plaintiff was a sales representative within the company throughout her employment, Mr. Watts distributed a majority or disproportionate amount of the call-ins for display ads to Caucasian sales representatives.

66. The Defendant's denial to Plaintiff, of receiving call-ins for display ads resulted in Plaintiff's denial of opportunity for commissions.

67. The Defendant's denial to Plaintiff, of receiving call-ins for display ads also resulted in Plaintiff being denied the opportunity to fairly compete in the monetary incentive contests ("spiffs").

68. The failure of the Defendant to promulgate written, objective guidelines in the

distribution of the call-ins was an invitation by Peggy Onstad and John Watts to engage in racial discrimination against employees of color under the guise of exercise of managerial discretion or prerogative.

69.   The invitation by Peggy Onstad and John Watts to engage in racial discrimination against employees of color, under the guise of exercise of managerial discretion or prerogative was accepted by them, as they specifically employed subjective decision-making, infected with the taint of racial prejudice, when engaged in the distribution of call-ins on behalf of the Defendant, to the detriment of the Plaintiff.

70.   The failure of the Defendant to promulgate written, objective guidelines in the distribution of the call-ins, coupled with Peggy Onstad's and John Watts' biased distribution of the call-ins had an adverse impact upon the Plaintiff.

71.   On or about October of 2003, the Plaintiff complained to the Defendant, via its employees, supervisors, and upper management, (Watts and Onstad), regarding their failure to consider her when devising the "spiffs", and for their failure to distribute call-ins to her in an amount which was proportionate to the Caucasian sales employees.

72.   The Defendant did nothing to remedy the situation, but continued their disparate practices and adverse treatment of the Plaintiff.

73    Within two months after Plaintiff complained to management about the biased policies implemented within the Defendant's workplace, she was terminated, on December 11, 2003.

74.   The Defendant told the Plaintiff that the reason for her termination was because they were "eliminating classified advertising in the newspaper", and that her "services were no longer needed".

11

75. The Defendant made the determination that the Plaintiff's "services were no longer needed" selling classified ads, but refused to consider keeping the Plaintiff employed selling display ads.

76. The Plaintiff inquired of the Defendant as to whether her job performance affected the Defendant's decision to terminate her, and she was specifically told by the Defendant, "no, you have been an excellent employee here".

77. The Plaintiff also asked the Defendant if she could remain in the sales department, but perform other tasks, such as continuing selling display ads, or perform field work, to which the Defendant replied, "we have no other position in our sales department, available at this time".

78. The statement told to Plaintiff by Defendant, that "we have no other positions in our sales department, available at this time", was false, as the Defendant had at least two positions available within its sales department as of December 11, 2003

79. On or about November 20, 2003, the Defendant advertised, via the internet, job listing for "print advertising sales" within its sales department.  This listing was to expire January 19, 2004.

80. On or about November 22, 2003, the Defendant advertised, via the internet, a job listing for "advertising sales" within its sales department.  This listing specifically called for responsibilities in the field of advertising, as well as marketing and public relations.  This listing was to expire January 21, 2004.

81. At the time the Defendant told the Plaintiff of no vacancies within its sales department, on December 11, 2003, it had not filled the "print advertising sales" position, nor had it filled the "advertising sales position"

82. At the time the Defendant told Plaintiff of no vacancies in its sales department, it knew of the two positions that it had advertised three weeks prior.

83. At the time the Defendant told Plaintiff of no vacancies in its sales department, it knew of the Plaintiff's solid performance record with the company.

84. At the time the Defendant told Plaintiff of no vacancies in its sales department, it knew of the Plaintiff's previous work experience in recruitment advertising, marketing, and public relations

85. In spite of the Defendant's knowledge of Plaintiff's work history, performance potential, and experience, Defendant lied to the Plaintiff about job opportunities within its company.

86. In spite of the Defendant's knowledge of Plaintiff's work history, performance potential, and experience, Defendant lied to the Plaintiff by not informing her about positions that it was advertising on the internet.

87. In spite of the Defendant's knowledge of Plaintiff's work history, performance potential, and experience, Defendant denied the Plaintiff the opportunity to resume working with the Defendant.

88. In essence, on December 11, 2003, the Plaintiff verbally applied for another position within the sales department of the Defendant's company, which was rejected by the Defendant.

89. Additionally, shortly after the Plaintiff's termination the Defendant decided to begin selling recruitment ads (a help wanted section) within its newspaper.

90. The Defendant knew that the Plaintiff had experience in selling recruitment ads at the time of her hire by the Defendant, and the time of her termination.

91.   In spite of the Defendant's knowledge of Plaintiff's experience in selling recruitment ads, and in spite of Plaintiff's request to be given assignments other than selling classified ads, the Defendant refused to consider the Plaintiff to sell recruitment ads for the newspaper.

92.   When the Defendant told the Plaintiff that "we have no other position in our sales department, available at this time", it knew that it had an intention to begin selling recruitment ads within its newspaper.

93.   When the Defendant told the Plaintiff that "we have no other position in our sales department, available at this time", it knew that Plaintiff had prior experience and adequate qualifications selling recruitment ads.

94.   Instead of offering the Plaintiff a position selling recruitment ads within its newspaper, the Defendant chose instead to offer the position of selling recruitment ads to a Caucasian female employee who had less experience than the Plaintiff

95.   The Defendant did give the assignment of selling recruitment ads to a Caucasian female employee who had less experience than the Plaintiff.

96.   The Defendant made this choice to offer and give the position of selling recruitment ads to a Caucasian female employee who had less experience than the Plaintiff, because they did not want the Plaintiff working for the Defendant on account of her race.

97.   Additionally, at the time of Plaintiff's termination, there were outstanding commissions due her, on revenue generated by the Plaintiff, via the sales that she made for the partial month of December, most of which were paid for by credit card.

98.   For the month of December, the Plaintiff had a monthly sales goal in excess of
      $40,000.00, and had, by December 11, 2003, almost met her goal, generating
      revenue in excess of $30,000.00 during the first 11 days of the month of December.

99.   Plaintiff maintains that most of the revenue generated for the first 11 days of the
      month of December was paid to the Defendant via credit card, thus entitling her to a
      commission on those funds.

100   There were also outstanding commissions due Plaintiff, on revenue generated by
      the Plaintiff, via the sales that she made for the partial month of December, which
      were collected by the Defendant after the Plaintiff was terminated.

101.  There were also outstanding commissions due Plaintiff, on revenue generated by
      her, via sales she made for future ads, and other contracted ads of 13 weeks, 26
      weeks, and 52 weeks, that had not run in the newspaper at the time of Plaintiff's
      termination, but most of which [revenue] was paid in advance by the client via
      credit-card prior to Plaintiff's termination.

102.  There were also outstanding commissions due Plaintiff, on revenue generated by
      her via sales she made for future ads, and other contracted ads of 13 weeks, 26
      weeks, and 52 weeks, that had not yet run in the newspaper at the time of Plaintiff's
      termination, but the balance of which [revenue] was collected by the Defendant
      after the Plaintiff's termination.

103.  There were also outstanding bonuses due Plaintiff, for selling ads in a holiday
      section of the Defendant's newspaper between December 1 and December 11,
      2003.

104.  On December 11, 2003, the Defendant paid the Plaintiff $1,267.67, which was to
      cover her pro-rata share for the salary she earned for the first 11 days of December,

with the balance to cover any commissions generated by the Plaintiff for those same 11 days of December. The Plaintiff received her final paycheck on December 15, 2003, which covered salary and commissions for November 2003.

105. As the Plaintiff had generated revenue in excess of $30,000.00 during the first 11 days of December, the Defendant has failed to pay Plaintiff commissions which she was due.

106. As the Plaintiff had generated revenue on sales of ads that had not yet run in the newspaper as of December 11, 2003, the Defendant has failed to pay Plaintiff commissions which she was due.

107. As the Defendant had also "collected" revenue on the sales of ads outlined in paragraphs 100-102 of the Complaint, after the Plaintiff was terminated, the Plaintiff is entitled to receive a commission on those "collected" funds, which the Defendant has refused to pay.

108. The Defendant had also failed to pay bonuses to the Plaintiff, which were promised to the Plaintiff for selling ads in the holiday section of the Defendant's newspaper during the month of December.

109. As a result of Defendant's failure to pay Plaintiff commissions that were due her as of December 11, 2003, the Defendant was unjustly enriched.

110. As a result of Defendant's failure to pay Plaintiff commissions that on sales procured by her, but collected after her termination, the Defendant was unjustly enriched.

111. Defendant has tried to assert that it owes the Plaintiff no further commission because the revenue that Plaintiff claims she is entitled to a commission was not "cash-in" as of December 11, 2003.

16

112. The Plaintiff avers that all sales made via a credit-card were "cash-in" pursuant to the agreement between Plaintiff and Defendant, thus entitling her to a commission.

113. The Plaintiff further alleges that all revenue collected after Plaintiff's termination, on sales procured by Plaintiff during her employment, would be subject to a commission in Plaintiff's favor.

114. Moreover, the Plaintiff alleges that she would be entitled to commissions on all sales made by her at the time of her termination, as the Defendant has followed that practice with Caucasian sales representatives that have been terminated by the Defendant.

115. Plaintiff alleges that for Defendant to pay other sales representative, who have been terminated by the Defendant, commissions on all sales made by the sales representative, and not follow the practice in her case, amounts to yet another course of disparate treatment followed by the Defendant against the Plaintiff

116. Further, Plaintiff alleges that the Defendant orchestrated a scheme to terminate Plaintiff on December 11, 2003, so as to claim that her sales made for the month of December, (and for future ads not yet run in the newspaper) were not "cash-in" at the time of her termination.

117. Plaintiff alleges that Defendant terminated Plaintiff on December 11, 2003, so as to try and avoid paying Plaintiff commissions that were due her.

118. Plaintiff alleges that the Defendant's termination of Plaintiff on December 11, 2003, so as to try and avoid paying commissions that were due her amounted to bad faith.

119. Plaintiff alleges that the Defendant's decision to terminate Plaintiff on December 11, 2003, allowed the Defendant to become unjustly enriched, as it deprived the Plaintiff to obtain commissions for sales made by her for the Defendant.

120. Plaintiff alleges that the Defendant terminated Plaintiff in order to avoid its' obligation in paying the Plaintiff commissions that she earned, through services that she already rendered to the Defendant.

121. Plaintiff alleges that the Defendant terminated Plaintiff in order to avoid its' obligation in paying the Plaintiff commissions that she almost earned, on revenue collected by the Defendant after Plaintiff's termination, through services that she already rendered to the Defendant.

122. Additionally, Plaintiff was entitled, pursuant to the agreement with her employer, that she would be entitled to payment of unused vacation time.

123. The Plaintiff had accrued approximately 8 days of vacation time from April 3, 2002, to December 11, 2003.

124. As of December 11, 2003, the Plaintiff took full vacation days on August 29, September 7, November 26, and November 8, 2003. Plaintiff also took half-days of vacation on November 13, and November 25, 2003. Plaintiff also took 2 hours of vacation on October 10, 2003.

125. As of December 11, 2003, the Plaintiff had used approximately five days and two hours to be applied against the 8 days of vacation time that she had accrued up to the date of her termination, leaving approximately 2 days and 6 hours of vacation time that Plaintiff is entitled to compensation.

126. Defendant refused to compensate Plaintiff for her unused vacation time.

127. Further, on December 3, 2003, the Plaintiff applied to the Defendant's 401 K plan. The Plaintiff specifically left the application with Mr. Rick Stoehrer, the person who administers the plan for the Defendant.

128. Plaintiff's understanding was that after the application was processed, the first contribution to the plan was to be deducted from the next paycheck she would receive, which in the present instance would have been on December 15, 2003.

129. The Defendant did not process the 401 K application submitted by the Plaintiff on December 3, 2003.

130. The Plaintiff inquired of Mr. Rick Stoehrer, who was the office manager employed by the Defendant at the time, shortly after she submitted the 401 K application, if it was processed.

131. Mr. Stoehrer indicated to Plaintiff that he did not have the application, as he lost it.

132. Plaintiff complained to Peggy Onstad about her "lost" 401K application, and Onstad told Plaintiff she would speak to Mr. Stoehrer, and subsequently the application was found prior to Plaintiff's termination of December 11, 2003

133. Even though the Plaintiff's 401K application was found prior to her termination, the application was not processed by the Defendant prior to her termination.

134. After the Defendant terminated the Plaintiff on December 11, 2003, the Defendant gave the Plaintiff one paycheck for payment for services rendered in the month of December on December 11, 2003

135. The Defendant gave the Plaintiff another paycheck for payment for services rendered in the month of November on December 15, 2003.

136. The Defendant did not use any of the funds tendered to the Plaintiff on December 11, 2003 to fund the 401K plan.

137. The Defendant did not use any of the funds tendered to the Plaintiff on December 15, 2003, to fund the 401 K plan.

19

138.  As a result of the Defendant's actions, the Plaintiff was unable to take advantage of the 401K plan offered by the Defendant

139.  After the Plaintiff's termination by the Defendant, the Defendant filled the positions that were advertised by the internet for "print advertising sales" and "advertising sales".

140.  After the Plaintiff's termination by the Defendant, the Defendant filled the positions that were advertised via the internet for "print advertising sales" and "advertising sales" with persons of Caucasian descent.

141.  After the Plaintiff's termination by the Defendant, the Defendant filled the positions that were advertised via the internet for "print advertising sales" and advertising sales" with person of Caucasian descent, who were either equal to Plaintiff, or less than Plaintiff, in terms of qualifications.

142   After the Plaintiff's termination by the Defendant, and after Plaintiff specifically expressed a desire to remain employed selling ads for the Defendant in its sales department, the Defendant offered the opportunity to sell recruitment ads to a person of Caucasian descent, a person who had less experience than Plaintiff in selling recruitment ads.

143.  On December 16, 2004, the Plaintiff filed an action for discrimination against the Massachusetts Commission against Discrimination.

144   As a direct proximate result of the Defendant's denial of Plaintiff's commissions and bonuses that she was due at the time of her termination, Plaintiff has been caused to suffer great pain in body and mind, has been damaged professionally, has been prevented from transacting her business, and has been otherwise damaged.

145. As a direct and proximate result of the Defendant's denial of Plaintiff's commissions on collected revenue after her termination, Plaintiff has been caused to suffer great pain in body and mind, has been damaged professionally, has been prevented from transacting her business, and has been otherwise damaged.

146. As a direct proximate result of the Defendant's failure to pay Plaintiff for all accrued vacation time at her termination, caused Plaintiff to suffer great pain in body and mind, and has been prevented from transacting her business, and has been otherwise damaged.

147. As a direct proximate result of the Defendant's failure to submit her application to be enrolled in the Defendant's 401K plan, caused Plaintiff to suffer great pain in body and mind, and has been prevented from transacting her business, and has been otherwise damaged.

148. As a direct proximate result of the Defendant's failure to deny her verbal application for other sales positions within the company, the Plaintiff was caused to suffer great pain in body and mind, and has been prevented from transacting her business, and has been otherwise damaged.

149. As a direct proximate result of the false information that Defendant told Plaintiff, that they had no open positions within their sales department, caused Plaintiff to forgo submitting a written application to the Defendant to fill any open positions, and caused her to be denied an opportunity to resume her employment with the Defendant.

150. As a direct proximate result of Defendant's denial of an opportunity to Plaintiff to resume her employment with the Defendant, caused Plaintiff to suffer great pain in

body and mind, and has be prevented from transacting her business, and has been otherwise damaged.

151    As a direct proximate result of the Defendant's hire of two white employees to fill the positions that a employee like Plaintiff was qualified for, and verbally applied for, caused Plaintiff to suffer great pain in body and mind, and has been prevented from transacting her business, and has been otherwise damaged.

152    As a direct proximate result of the Defendant's failure to include Plaintiff in the "spiffs", that were granted to other white sales representatives, caused Plaintiff to suffer great pain in body and mind, and has been prevented from transacting her business, and has been otherwise damaged.

153    As a direct proximate result of the Defendant's failure to distribute a fair share of call-ins to the Plaintiff, rather to show a bias to white sales representatives, by giving them a disproportionately greater amount of call-ins, caused Plaintiff to suffer great pain in body and mind, and has prevented her from transacting her business, and has been otherwise damaged.

154    Plaintiff interpreted this Defendant's actions towards Plaintiff to be a measure of Defendant's antipathy towards her because she was a person of color.

155    The Defendant had a policy that its employees could meet with management in order to attempt to eliminate interpersonal difficulties and to improve job performance and promote harmony between supervisor and supervisee.

156    In keeping with this policy, Plaintiff has met with supervisory officials employed by the Defendant during her employment to protest against bias and disparate treatment she received in relation to white sales representatives, all the while placing the Defendant on notice as to their discriminatory practices.

157.   The Defendant has either refused or failed to address her concerns so as to remedy the discriminatory practices applied against him throughout her employment, in violation of company policy.

158.   As a direct and proximate result of the discriminatory treatment described above, to which the Defendant's supervisors and other personnel subjected Plaintiff, and of the separate impact of alleged facially neutral employment practices and policies, above described, Plaintiff was harmed physically, emotionally, professionally, and financially

159.   The discriminatory practices described above, are not job related and are not necessary for the transaction of the business of the Defendant.

160.   All conditions precedent to the filing of this action have occurred and/or have been fulfilled

161.   The reasons offered by defendant for any action taken against the Defendant are a pretext for discrimination

### CLAIMS FOR RELIEF

### COUNT 1:

### EMPLOYMENT DISCRIMINATION – WRONGFUL TERMINATION, DISPARATE TREATMENT and ADVERSE EMPLOYMENT ACTION IN VIOLATION OF MASS GEN. LAWS. CHAP. 151B

162.   Plaintiff repeats and re-avers all of the averments of paragraphs 1 through 161 with the same force and effect as if fully set forth herein.

163.   Defendant is an "employer" within the meaning of Mass.Gen.L. c. 151B, § 1(5)

164.   Plaintiff is an "employee" within the meaning of Mass.Gen.L. c. 151B, § 1(6), and a racial minority within the meaning of Mass.Gen.L. c. 151B.

23

165    Defendant violated plaintiff's rights secured by G.L. c 151B §4, by the Defendant's
disparate treatment, taken against the Plaintiff as described in the aforementioned
paragraphs, said actions causing damage to Plaintiff's body, and mind, as well as
preventing her from transacting her business, and has otherwise caused her damage.

166.    Defendant violated plaintiff's rights secured by G.L. c 151B §4, by the Defendant's
adverse actions, taken against Plaintiff's status of employment, as described in the
aforementioned paragraphs, said actions causing damage to Plaintiff's body, and
mind, as well as preventing her from transacting her business, and has otherwise
caused her damage.

167    Defendant violated plaintiff's rights secured by G.L. c 151B §4, by the Defendant's
actions, in rejecting Plaintiff, who was a qualified applicant, seeking a sales position
within the Defendant's company, rather continuing their solicitation of applicants,
and hiring persons with less qualifications than the Plaintiff, as described in the
aforementioned paragraphs, said actions causing damage to Plaintiff's body, and
mind, as well as preventing her from transacting her business, and has otherwise
caused her damage.

168    Defendant violated plaintiff's rights secured by G.L. c 151B §4, by the Defendant's
actions, in refusing to consider Plaintiff, who was a qualified applicant, seeking to
sell recruitment ads within the Defendant's company, rather offering the
opportunity to sell recruitment ads to a person with less experience and
qualification than Plaintiff, as described in the aforementioned paragraphs, said
actions causing damage to Plaintiff's body, and mind, as well as preventing her
from transacting her business, and has otherwise caused her damage.

24

## COUNT 2:

## BREACH OF CONTRACT -- COMMISSIONS

169. Plaintiff repeats and re-avers all of the averments of paragraphs 1 through 168 with the same force and effect as if fully set forth herein.

170. During the course of Plaintiff's employ with Defendant, Defendant promised her that in exchange for her employment, she would be paid a 10% commission on all **collected** sales procured by her over $17,110.00, and 15% over $25,000.00.

171. There was nothing in the agreement that limited the term "collected" sales to sales that were collected while Plaintiff was still employed with the Defendant.

172. The verbal and written promises exchanged between the Plaintiff and Defendant, as it related to how Plaintiff would be paid a commission amounted to a binding contract between the parties.

173. Between December 1, 2003, and December 11, 2003, Plaintiff procured sales in excess of $30,000.00, most of which was paid by credit card, and collected by the Defendant.

174. Also Plaintiff procured sales for future ads, paid for by credit-card, which were collected by the Defendant, which had not yet run in the newspaper at the time of her termination.

175. Further Plaintiff procured sales for ads whose revenue was collected by the Defendant after the Plaintiff was terminated.

176. Defendant never paid the Plaintiff the full amount of the commission owed to her for sales procured between December 1, 2003 and December 11, 2003.

177. Defendant never paid the Plaintiff the full amount of the commission owed to her for her procured sales for the future ads.

25

178    Defendant never paid the    Plaintiff the full amount of the commission owed to her for her procured sales, whose revenue was collected by the Defendant after she was terminated.

179    Defendant breached the terms of the agreement of the contract it had with the Plaintiff, in that they refused to pay commissions due her on sales procured and collected revenue between December 1, 2003 and December 11, 2003.

180.    Defendant breached the terms of the agreement of the contract it had with the Plaintiff, in that they refused to pay commissions due her for sales on future ads, that were collected by the Defendant before and after she was terminated.

181    Said breaches have harmed the Plaintiff professionally, has prevented the Plaintiff from transacting her business, has caused her financial damage, and has damaged her otherwise.

## COUNT 3:

## BREACH OF CONTRACT -- BONUSES

182    Plaintiff repeats and re-avers all of the averments of paragraphs 1 through 181 with the same force and effect as if fully set forth herein.

183    During the course of Plaintiff's employ with Defendant, Defendant promised her that in exchange for her employment she would be paid a bonus for her performance on selling ads within the holiday section of the Defendant's newspaper between December 1 and December 11, 2003.

184.    The promises exchanged between the Plaintiff and Defendant amounted to a binding contract between the parties.

185.   Between December 1, 2003, and December 11, 2003, Plaintiff performed her work, selling ads within the holiday section of the Defendant's newspaper to a level which entitled her to a bonus as promised to the Plaintiff for her effort

186    Defendant never paid the Plaintiff the bonus owed to her for her performance selling holiday ads December 1, 2003 and December 11, 2003

187    Defendant breached the terms of the agreement of the contract it had with the Plaintiff, by not paying the Plaintiff the bonus owed to her

188.   Said breach has harmed the Plaintiff professionally, has prevented the Plaintiff from transacting her business, has caused her financial damage, and has damaged her otherwise

## COUNT 4:

### BREACH OF CONTRACT – VACATION TIME

189.   Plaintiff repeats and re-avers all of the averments of paragraphs 1 through 188 with the same force and effect as if fully set forth herein.

190    During the course of Plaintiff's employ with Defendant, Defendant promised her that in exchange for her employment, she would accrue vacation time at the rate of .4 days a month, and that she would be entitled to receive the vacation pay should her employment with the Defendant cease.

191    The promises exchanged between the Plaintiff and Defendant amounted to a binding contract between the parties

192    Between April 3, 2002, and December 11, 2003, Plaintiff accrued approximately 8 days in vacation time

193.   Between April 3, 2002, and December 11, 2003, Plaintiff used approximately 5 days, and 2 hours worth of accrued vacation time

27

194   The Defendant owes the Plaintiff approximately 2 days and 6 hours worth of vacation time, which the Defendant has refused to pay

195   Defendant's refusal to pay Plaintiff for unused vacation time is a breach of the agreement it had with the Plaintiff regarding unused vacation time

196   Said breach has harmed the Plaintiff professionally, has prevented the Plaintiff from transacting his business, has caused her financial damage, and has damaged her otherwise.

## COUNT 5:

## BREACH OF CONTRACT- 401K PLAN

197   Plaintiff repeats and re-avers all of the averments of paragraphs 1 through 196 with the same force and effect as if fully set forth herein

198   During the course of Plaintiff's employ with Defendant Defendant promised her that in exchange for her employment, she would be able to take advantage of the Defendant's 401K plan.

199   All the Plaintiff needed to do to take advantage of the 401K plan promised by the Defendant was to submit an application, where the Defendant promised it would process it, and fund the Plan with the first paycheck received after the application had been processed.

200   The promises exchanged between Plaintiff and Defendant amounted to a binding contract between the parties.

201   On December 3, 2003, the Plaintiff submitted an application to the Defendant for processing in order for her to take advantage of the 401K plan.

202   The Defendant never processed the application on December 3, 2003, and terminated the Plaintiff on December 11, 2003

28

203    The Defendant breached the promise tha    made with the Plaintiff to process the
application.

204.    Said breach has harmed the Plaintiff professionally, has prevented the Plaintiff from
transacting her business, has caused her financial damage, and has damaged her
otherwise

## COUNT 6:

## BREACH OF CONTRACT- MONEY HAD AND RECEIVED, THE DEFENDANT'S UNJUST ENRICHMENT

205    Plaintiff repeats and re-avers all of the averments of paragraphs 1 through 204 with
the same force and effect as if fully set forth herein

206    The Plaintiff's employment at-will with the Defendant carried with it an agreement
that Defendant would pay Plaintiff a commission on all revenue regarding sales
made by the Plaintiff, and collected by the Defendant

207    The Plaintiff's employment at-will with the Defendant carried with it an agreement
that should the Defendant collect revenue regarding sales made by the Plaintiff
during her employment, but collected after she was terminated, then equity and
good conscience would require that Defendant pay the Plaintiff a commission on
said revenue

208    For the Defendant to retain a commission owed to the Plaintiff, in connection with
any sale made by the Plaintiff during her employment, would unjustly enrich the
Defendant to the detriment of the Plaintiff.

209    After the Defendant's termination of the Plaintiff on December 11, 2003, it has
retained commissions owed to the Plaintiff, regarding sales she made during her
employment, and has been unjustly enriched to the detriment of the Plaintiff, and
constitutes breach of contract.

210.  Said breach has harmed the Plaintiff professionally, has prevented the Plaintiff from transacting her business, has caused her financial damage, and has damaged her otherwise.

## COUNT 7:

## BREACH OF CONTRACT- VIOLATION OF THE IMPLED COVENANT OF GOOD FAITH AND FAIR DEALING

211.  Plaintiff repeats and re-avers all of the averments of paragraphs 1 through 210 with the same force and effect as if fully set forth herein.

212.  The Plaintiff's employment at will with the Defendant carried with it an implied covenant of good faith and fair dealing, which promised the Plaintiff that she would not be terminated in order to avoid payment of compensation earned by her through services already rendered to the employer.

213.  The Plaintiff's employment at will with the Defendant carried with it an implied covenant of good faith and fair dealing, which promised the Plaintiff that she would not be terminated in order to avoid payment of compensation almost earned by her through services already rendered to the employer.

214.  The termination of the Plaintiff's employment for the reasons described in paragraphs 212 and 213, amounts to a termination in bad-faith, and a breach of contract.

215.  The Defendant's termination of Plaintiff on December 11, 2003, was made in bad faith as it was done in order to avoid payment of compensation either earned by her or almost earned by her through services already rendered to the employer.

216.  The Defendant's termination of Plaintiff on December 11, 2003, caused the Defendant to become unjustly enriched.

30

217. The Defendant's termination of Plaintiff on December 11, 2003, is a violation of the implied covenant of good faith and fair dealing, and is a breach of contract

218. Said breach has harmed the Plaintiff professionally, has prevented the Plaintiff from transacting her business, has caused her financial damage, and has damaged her otherwise.

WHEREFORE, plaintiff prays that this Court:

    1.    Award compensatory damages to plaintiff;

    2.    Award punitive damages against defendant;

    3.    Award Plaintiff all outstanding commissions owed to her;

    4.    Award Plaintiff all outstanding bonuses owed to her;

    5.    Award Plaintiff all back-pay, and front-pay

    6.    Award costs and reasonable attorney's fees; and

    7.    Grant such other and further relief which may be appropriate and/or necessary.

PLAINTIFF DEMANDS TRIAL BY JURY

ANNETTE HARDING,
By her attorney,

Gordon W. Spencer, Esq
1256 Park Street, Suite 104
Stoughton, MA 02072
(781) 297-9293

31

COMMONWEALTH OF MASSACHUSETTS                    SUFFOLK, S

I, Annette Harding, having been sworn, depose and say that I am the plaintiff in the foregoing action, that I have read the averments of the complaint and that they are true of my knowledge.

_Annette M Harding_
Annette Harding
February 14, 2005

Signed and sworn to before me this _14th_ day of February, 2005.

_Pierre Richard J. Cornely_
Notary Public
My Commission expires:
    2/2008

32

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ANNETTE HARDING,
                    Plaintiff

v.                                                    Civil Action No. _____

BOSTON METRO PUBLISHING,
                    Defendant

## NOTICE OF FILING OF NOTICE OF REMOVAL

To:    Civil Clerk's Office
       Suffolk County
       Superior Court Department
       U.S. Post Office & Courthouse, 8th Floor
       90 Devonshire Street
       Boston, MA 02109

       **PLEASE TAKE NOTICE** that a Notice of Removal in the above action from the

Suffolk Superior Court has been duly filed in the U.S. District Court for the District of

Massachusetts. Attached hereto is a copy of that Notice of Removal.

                            Respectfully submitted,

                            BOSTON METRO PUBLISHING
                            By its attorneys,

                            _____
                            Thomas Royall Smith, BBO #470300
                            Erik J. Winton, BBO #600743
                            Jackson Lewis LLP
                            75 Park Plaza
                            Boston, MA 02116
                            (617) 367-0025

Dated:  March 24, 2005

### CERTIFICATE OF SERVICE

       This hereby certifies that on this 24th day of March, 2005, a copy of the foregoing was served upon
Plaintiff's counsel, Gordon W. Spencer, Esq., 1256 Park Street, Suite 104, Stoughton, MA, via first-class mail,
postage prepaid.

                            _____
                            Jackson Lewis LLP

JS 44   (Rev. 11/04)

## CIVIL COVER SHEET 05 10576 GAO

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

### I. (a)  PLAINTIFFS

ANNETTE HARDING

**DEFENDANTS**

BOSTON METRO PUBLISHING

**(b)** County of Residence of First Listed Plaintiff   Suffolk
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Suffolk
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Gordon W. Spencer, 1256 Park Street, Suite 104,
Stoughton, MA 02072 - (781) 297-9293

Attorneys (If Known)
Thomas Royall Smith, Erik J. Winton, JACKSON LEWIS LLP,
75 Park Plaza, 4th Floor, Boston, MA 02116 - (617) 367-0025

### II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3  Federal Question (U.S. Government Not a Party) |
| ☐ 2 | U.S. Government Defendant | ☐ 4  Diversity (Indicate Citizenship of Parties in Item III) |

### III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)          and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☒ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

### V. ORIGIN   (Place an "X" in One Box Only)

| | | | | | | Appeal to District |
|---|---|---|---|---|---|---|
| ☐ 1 Original Proceeding | ☒ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Judge from Magistrate Judgment |

### VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
29 U.S.C Sections 1002, 1003, 1132, 1144

Brief description of cause:
Claim regarding Employee Pension Plan

### VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☐ No

### VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE                          DOCKET NUMBER

DATE   3/24/05

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1.  Title of case (name of first party on each side only) __Annette Harding v. Boston Metro Publishing__

2.  Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local rule 40.1(a)(1)).

    [ ]  I.    160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

    [✓]  II.   195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,   *Also complete AO 120 or AO 121
                740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.          for patent, trademark or copyright cases

    [ ]  III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
                315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
                380, 385, 450, 891.

    [ ]  IV.   220, 422, 423, 430, 460, 480, 490, 610, 620, 630, 640, 650, 660,
                690, 810, 861-865, 870, 871, 875, 900.

    [ ]  V.    150, 152, 153.

## 05   10576 GAO

3.  Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.
    N/A

4.  Has a prior action between the same parties and based on the same claim ever been filed in this court?
                                                              YES [ ]    NO [✓]

5.  Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)
                                                              YES [ ]    NO [✓]

    If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
                                                              YES [ ]    NO [✓]

6.  Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
                                                              YES [ ]    NO [✓]

7.  Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).
                                                              YES [✓]    NO [ ]

    A.  If yes, in which division do all of the non-governmental parties reside?

        Eastern Division [✓]      Central Division [ ]        Western Division [ ]

    B.  If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

        Eastern Division [ ]      Central Division [ ]        Western Division [ ]

8.  If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)
                                                              YES [ ]    NO [✓]

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME   Thomas Royall Smith, Erik J. Winton
ADDRESS   JACKSON LEWIS LLP, 75 Park Plaza, 4th Floor, Boston, MA 02116
TELEPHONE NO.   617-367-0025

(CategoryForm.wpd - 2/15/05)