**jackson | lewis**

Attorneys at Law

Representing Management Exclusively in Workplace Law and Related Litigation

**Jackson Lewis LLP**
**75 Park Plaza**
**Boston, Massachusetts 02116**
Tel 617 367-0025
Fax 617 367-2155
www.jacksonlewis.com

ATLANTA, GA
BOSTON, MA
CHICAGO, IL
DALLAS, TX
GREENVILLE, SC
HARTFORD, CT
LONG ISLAND, NY

LOS ANGELES, CA
MIAMI, FL
MINNEAPOLIS, MN
MORRISTOWN, NJ
NEW YORK, NY
ORLANDO, FL
PITTSBURGH, PA

SACRAMENTO, CA
SAN FRANCISCO, CA
SEATTLE, WA
STAMFORD, CT
WASHINGTON, DC REGION
WHITE PLAINS, NY

March 29, 2005

**VIA HAND DELIVERY**

Clerk of Court
United States District Court
District of Massachusetts
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Room 2300
Boston, MA 02210

      Re:   *Harding v. Boston Metro Publishing*
             *Civil Action No. 05-10576 GAO*

Dear Sir/Madam:

      Enclosed please find certified copies of all pleadings from Suffolk Superior Court in the above matter.

      Kindly date-stamp the enclosed copy of this letter and return it to the awaiting messenger.

      Thank you for your attention to this matter.

                    Very truly yours,

                    JACKSON LEWIS LLP

                    Erik J. Winton

EJW:dsv
Enclosures

cc:   Gordon W. Spencer, Esq.
       Thomas Royall Smith, Esq.

03/25/2005
guen
11:47 AM

**Commonwealth of Massachusetts**
SUFFOLK SUPERIOR COURT
Case Summary
Civil Docket

### SUCV2005-00617
### Harding v Boston Metro Publishing

| | | | | | |
|---|---|---|---|---|---|
| File Date | 02/16/2005 | Status | Disposed: transfered to other court (dtrans) | | |
| Status Date | 03/25/2005 | Session | G - Civil G | | |
| Origin | 1 | Case Type | B22 - Employment Discrimination | | |
| Lead Case | | Track | F | | |

| | | | | | |
|---|---|---|---|---|---|
| Service | 05/17/2005 | Answer | 07/16/2005 | Rule12/19/20 | 07/16/2005 |
| Rule 15 | 07/16/2005 | Discovery | 12/13/2005 | Rule 56 | 01/12/2006 |
| Final PTC | 02/11/2006 | Disposition | 04/12/2006 | Jury Trial | Yes |

**PARTIES**

**Plaintiff**
Annette Harding
Active 02/16/2005

**Private Counsel 630488**
Gordon W Spencer
1256 Park Street
Suite 104
Stoughton, MA 02072
Phone: 781-297-9293
Fax:
Active 02/16/2005 Notify

**Defendant**
Boston Metro Publishing
Service pending 02/16/2005

**Private Counsel 470300**
Thomas Royal Smith
Jackson Lewis LLP
1 Beacon Street
Suite 3300
Boston, MA 02108
Phone: 617-367-0025
Fax: 617-367-2155
Active 03/25/2005 Notify

**Private Counsel 600743**
Erik J Winton
Jackson Lewis LLP
75 Park Plaza
Boston, MA 02116-
Phone: 617-367-0028
Fax: 617-367-2155
Active 03/25/2005 Notify

**ENTRIES**

| Date | Paper | Text |
|---|---|---|
| 02/16/2005 | 1.0 | Complaint  & Jury demand |
| 02/16/2005 | | Origin 1, Type B22, Track F. |
| 02/16/2005 | 2.0 | Civil action cover sheet filed |
| 03/24/2005 | | Certified copy of petition for removal to U. S. Dist. Court of Deft. |
| | | Boston Metro Publishing U. S. Dist.#(05-10576GAO). |
| 03/25/2005 | | Case REMOVED this date to US District Court of Massachusetts |

case01 245883 y y y y y y

Page 1 of 2

. HEREBY ATTEST AND CERTIFY ON
MARCH 25, 2005, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: _____

ASSISTANT CLERK.

| **CIVIL ACTION COVER SHEET** | **05-0617 G** | Trial Court of Massachusetts Superior Court Department County: Suffolk |
|---|---|---|

PLAINTIFF(S) *Annette Harding*

DEFENDANT(S) *Boston Metro Publishing*

ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE
*Gordon W. Spencer*
*1256 Park St.*
*Brighton, MA 00122*
Board of Bar Overseers number: *630488*

ATTORNEY (if known)
*Rob Bertsche*
*Prince Lobel, Glovsky & Tye*

## Origin code and track designation

Place an x in one box only:

- [x] 1. F01 Original Complaint
- [ ] 2. F02 Removal to Sup.Ct. C.231,s.104 (Before trial) (F)
- [ ] 3. F03 Retransfer to Sup.Ct. C.231,s.102C (X)
- [ ] 4. F04 District Court Appeal c.231, s. 97 &104 (After trial) (X)
- [ ] 5. F05 Reactivated after rescript; relief from judgment/Order (Mass.R.Civ.P. 60) (X)
- [ ] 6. E10 Summary Process Appeal (X)

## TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)

CODE NO. *B-22*  TYPE OF ACTION (specify) *Employment Disc.*  TRACK *(F)*  IS THIS A JURY CASE? (✓) Yes ( ) No

The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

### TORT CLAIMS
(Attach additional sheets as necessary)

A. Documented medical expenses to date:
1. Total hospital expenses ........................................ *None*
2. Total Doctor expenses ......................................... *None*
3. Total chiropractic expenses ................................... *None*
4. Total physical therapy expenses .............................. *None*
5. Total other expenses (describe) .............................. *None*
   Subtotal $ *28,136*

B. Documented lost wages and compensation to date ........... $ *28,136*
C. Documented property damages to date ......................... $ *None*
D. Reasonably anticipated future medical and hospital expenses ... $ *None*
E. Reasonably anticipated lost wages
F. Other documented items of damages (describe)  *commissions over $50000*  *at least $ 50,000*  $
G. Brief description of plaintiff's injury, including nature and extent of injury (describe)
*suffered lost wages, emotional distress*
*for wrongful termination based upon race; adverse employment*
*action based upon race; disparate treatment based upon race;*  $
TOTAL $ *78,136*

### CONTRACT CLAIMS
(Attach additional sheets as necessary)

Provide a detailed description of claim(s):
*See above on lost wages + commissions*

TOTAL $. ...........

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."

Signature of Attorney of Record _____  DATE *2/16/05*

AOTC-6 mtc005-11/99
A.O.S.C. 1-2000

SUFFOLK SUPERIOR CIVIL BUSINESS OFFICE
2005 FEB 16 P 2:28
MICHAEL JOSEPH DONOVAN CLERK/MAGISTRATE

. HEREBY ATTEST AND CERTIFY ON

MARCH 25, 2005 , THAT THE

FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: *Clara A. Walsh*

ASSISTANT CLERK.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANNETTE HARDING,<br>                    Plaintiff<br><br>v.<br><br>BOSTON METRO PUBLISHING,<br>                    Defendant | Civil Action No. _____ |

### NOTICE OF FILING OF NOTICE OF REMOVAL

To:    Civil Clerk's Office
       Suffolk County
       Superior Court Department
       U.S. Post Office & Courthouse, 8th Floor
       90 Devonshire Street
       Boston, MA 02109

**PLEASE TAKE NOTICE** that a Notice of Removal in the above action from the

Suffolk Superior Court has been duly filed in the U.S. District Court for the District of

Massachusetts.  Attached hereto is a copy of that Notice of Removal.

                          Respectfully submitted,

                          BOSTON METRO PUBLISHING
                          By its attorneys,

                          _____
                          Thomas Royall Smith, BBO #470300
                          Erik J. Winton, BBO #600743
                          Jackson Lewis LLP
                          75 Park Plaza
                          Boston, MA 02116
                          (617) 367-0025

Dated:  March 24, 2005

### CERTIFICATE OF SERVICE

    This hereby certifies that on this 24th day of March, 2005, a copy of the foregoing was served upon Plaintiff's counsel, Gordon W. Spencer, Esq., 1256 Park Street, Suite 104, Stoughton, MA, via first-class mail, postage prepaid.

                          _____
                          Jackson Lewis LLP



*Suffolk Superior #05-*
*05-617*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANNETTE HARDING,<br>        Plaintiff | |
| v. | Civil Action No. _____ |
| BOSTON METRO PUBLISHING,<br>        Defendant | |

## 05  10576  GAO

### NOTICE OF REMOVAL

TO THE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF MASSACHUSETTS:

PLEASE TAKE NOTICE the Defendant, Boston Metro Publishing ("Boston Metro"),

hereby serves notice of removal of the above-entitled action to this Court and makes the

following showing in support of such removal:

### PLEADINGS AND PROCEEDINGS TO DATE

1.      On or about February 16, 2005, an action was commenced in Suffolk Superior

Court of the Commonwealth of Massachusetts, entitled <u>Annette Harding v. Boston Metro</u>

<u>Publishing</u>, Civil Action No. 05-0617G, by the filing of a Summons and Complaint, copies of

which are attached hereto as <u>Exhibit A</u>.

2.      Defendant was served with a copy of said Complaint on February 24, 2005 by

service upon its registered agent for service.  The foregoing Summons and Complaint and the

Civil Action Cover Sheet constitute all the process, pleadings, and orders received by the

Defendant to date.  No further proceedings have occurred in the state action.

3.     This Court has original jurisdiction of this action because it involves a claim (Count 5) under a pension plan that is an employee benefit plan regulated by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), Sections 3(2), 3(3), 4(a), 29 U.S.C. §§ 1002(2), 1002(3), and 1003(a).  Specifically, this action involves either a claim of denial of benefits under a pension plan under  Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), or a claim of alleged failures or omissions in the administration of a pension plan under Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3).

### ERISA/FEDERAL QUESTION REMOVAL

4.     This Court has original jurisdiction of claims under Section 502(a) of ERISA, 29 U.S.C. § 1132(a), under the provisions of Section 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1), 28 U.S.C. § 1331 and 29 U.S.C. § 1441(b), in that Plaintiff here either  claims entitlement to benefits or claims the occurrence of  a breach of fiduciary duty under an employee pension plan, within the meaning of Section 3(2) of ERISA, 29 U.S.C. § 1002(2), covered by ERISA, Section 4 of ERISA, 29 U.S.C. Section 1003.  Civil enforcement rights under employee pension plans are governed by ERISA, and with inapplicable exception, the provisions of ERISA completely supersede and preempt any and all state laws to the extent that they relate to plans regulated by ERISA.  Section 514(a) of ERISA, 29 U.S.C. § 1144(a).

5.     Because the United States District Courts have original jurisdiction over, and federal law controls, actions brought to redress alleged denials of benefits and/or alleged acts regarding omissions in plan administration or mishandling of administrative functions under employee pension plans, Section 502(a), (e) of ERISA, 29 U.S.C. § 1132(a), (e), removal of this case to this Court under the circumstances herein is proper.  Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58 (1987).

-2-

9.    Defendant is providing notice to the Suffolk Superior Court and Plaintiff of this Notice of Removal in the form attached hereto as Exhibit B.

WHEREFORE, Defendant prays that the above action pending against it in Suffolk Superior Court, Commonwealth of Massachusetts Civil Action No. 05-0617G, be removed therefrom to this Court.

Respectfully submitted,

BOSTON METRO PUBLISHING
By its attorneys,

Thomas Royall Smith, BBO #470300
Erik J. Winton, BBO #600743
Jackson Lewis LLP
75 Park Plaza
Boston, MA 02116
(617) 367-0025

Dated:  March 24, 2005

## CERTIFICATE OF SERVICE

This hereby certifies that on this 24th day of March, 2005, a copy of the foregoing was served upon Plaintiff's counsel, Gordon W. Spencer, Esq., 1256 Park Street, Suite 104, Stoughton, MA, via first-class mail, postage prepaid.

Jackson Lewis LLP

-3-

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUFFOLK SUPERIOR COURT
C.A. NO. 05-

| | |
|---|---|
| ANNETTE HARDING, | ) |
| Plaintiff. | ) |
| v. | ) |
| | ) |
| BOSTON METRO PUBLISHING | ) |
| Defendant. | ) |
| | ) |
| | ) |

## VERIFIED COMPLAINT

### I.    PARTIES

1.    Plaintiff is a black female citizen of the United States living at 9 Edwin St. #2,

Boston, County of Suffolk, Massachusetts.

2.    Boston Metro Publishing is a corporation duly organized and doing business under

the laws of the Commonwealth of Massachusetts. Defendant maintains a place of

business at 320 Congress Street, Boston, County of Suffolk, Massachusetts.

### II.    FACTUAL ALLEGATIONS

3.    The Defendant's business consists of publishing and distributing the

5- day-a week newspaper, *Boston Metro*.  The newspaper is distributed free of

charge, and contains relatively short articles encapsulating the news of the day and

is designed to be read quickly by commuters.  The length of each day's issue is

strictly limited to 40 pages, of which no more than 50 percent is advertising, which

accounts for 100% of the company's total revenue.

4.   The ads are sold on the basis of size, with the larger ads priced higher than the smaller ones.

5.   The ads could also be categorized into "display ads" and "classified ads". Display ads are much larger than classified ads, and would generate more revenue than its smaller counterpart.

6.   The Plaintiff was hired under a contract at-will by the Defendant, to start work on April 3 2002, as a telesales representative, in the Defendant's sales department.

7.   One of the responsibilities of a telesales representative was to solicit advertising space within the Defendant's newspaper.

8.   On the same day of April 3, 2002, the Defendant and Plaintiff entered into a written agreement (hereinafter "the agreement") which outlined the terms and conditions of her at-will employment with the Defendant.

9.   More specifically, the agreement stated that Plaintiff's specific responsibilities were to include making sales calls to prospects across all categories with a minimum of twenty-five calls per day, tracking advertising orders into the computer system, report status and outcome to the sales, and to perform such other duties as the Defendant may assign.

10.  At the time of her hire, the Defendant promised the Plaintiff, as stated in the agreement, that in exchange for her employment with the company, she would get paid 26 thousand dollars per annum, plus a 10% commission on all "collected sales", (hereinafter, "cash-in" sales), if said amount exceeded $17,110.00 (9% commission if said amount did not exceed $17,110.00), and a 15% commission on revenue sales over $25,000.00 per month.

2

11.     The agreement also contained an implied covenant of good faith and fair dealing, that Plaintiff would not be terminated in order to avoid Defendant's obligation in paying the Plaintiff commissions that she earned, or almost earned, through services that she already rendered to the Defendant.

12.     The Defendant also admits that Plaintiff would not be terminated in order to avoid its obligation to pay the Plaintiff commission that she earned, through services that she already rendered to the Defendant.

13.     The Defendant further admits that Plaintiff would not be terminated in order to avoid its obligation to pay the Plaintiff commission that she almost earned, through services that she already rendered to the Defendant.

14.     The agreement also was silent as to Plaintiff's entitlement to any commission on sales generated by the Plaintiff, but "collected" by the Defendant, after the Plaintiff's employment with the Defendant had ceased.

15.     Defendant also promised Plaintiff that she would accrue vacation time at a rate of .4 days a month, and that in exchange for her employment with the company, she would be entitled to receive all unused vacation time, once her employment with the Defendant had ceased.

16.     At the beginning of her employment with the Defendant, Plaintiff was assigned to sell display ads.  The Plaintiff excelled at her position.

17.     After the passage of time, however, and in spite of Plaintiff's superior job performance in selling display ads, Defendant altered Plaintiff's job responsibilities within the sales department to selling mostly classified ads.

18.     Even though the Plaintiff's job responsibilities were modified, the Plaintiff still remained a sales representative within the Defendant's company, and the Plaintiff

was still authorized to sell display ads for the Defendant. The Defendant merely instructed the Plaintiff to devote more time to selling classified ads.

19. Classifieds were billed at a flat rate of $29.00 per ad, a significantly lesser amount than the cost of display ads, and did not provide much opportunity to maximize the potential for lucrative commissions.

20. The Plaintiff interpreted the Defendant's modification in her job responsibility as a demotion, as she now had to work much harder in order to obtain commissions commensurate with what she had received selling mostly display ads.

21. Notwithstanding the modification in job responsibility, however, Plaintiff was committed to a long-term relationship with Defendant, was seeking to maintain employment within the Defendant's sales department indefinitely.

22. Once the Defendant modified the Plaintiff's job responsibilities, by instructing her to devote more of her time selling classified ads, Plaintiff performed her job in selling classified ads with diligence and superiority.

23. Plaintiff would usually sell the classified ads via the telephone, where the client would routinely pay the price of the advertising space via a credit card.

24. Plaintiff avers that as soon as the client would pay the price of the advertising space via a credit card, the transaction would be considered "cash-in", entitling her to a commission on that transaction.

25. Defendant also admits that as soon as the client would pay the price of the advertising space via a credit card, said transaction would be considered "cash-in", entitling the sales representative to a commission on that transaction.

26. Defendant admits that their policy of entitling their sales representatives to a commission on advertising space paid by credit card was carried out in practice, as

Plaintiff would promptly receive commissions on sales of advertising space paid by credit card.

27.   Defendant admits that their policy of entitling their sales representatives to a commission on advertising space paid by credit card was promised to the Plaintiff in exchange for her employment.

28.   Defendant has a policy by which it binds itself to observe fair employment practices, and pledges not to discriminate against its employees in the terms and conditions of employment on account of race, color, and national origin.

29.   The terms and provisions of the policy defined in paragraph 28 have become part of the terms of the contract of employment between Plaintiff and Defendant, and Plaintiff relied on such terms during her employment with Defendant.

30.   Employees of color, such as Plaintiff, were the intended beneficiaries of the provisions of the Defendant's policy delineated in Paragraph 28.

31.   At the time of Plaintiff's hire, the Defendant was aware of Plaintiff's prior work history in sales and advertising.

32.   At the time of Plaintiff's hire, the Defendant knew that from 1996 to 2001, Plaintiff was employed by the Community Newspaper Company in Needham, MA, a company owned by the Boston Herald.

33.   Defendant's knowledge of Plaintiff's previous employment with Community Newspaper Company also included that Plaintiff's initial job title was, "classified advertising sales representative", whereafter she was promoted to, "recruitment display advertising sales representative" within that company.

34.    Defendant was also aware at the time they hired Plaintiff that she had marketing and public relations experience while working for Community Newspaper Company.

35.    On or about November of 2002, Ms. Peggy Onstad joined the Defendant's company (Boston Metro) as its Vice President of Sales, Marketing and Promotions.

36.    Soon after Onstad's arrival, the Plaintiff began experiencing what she characterizes as a "racist atmosphere" within the work place, demonstrated specifically by the Defendant's disparate treatment of her, via the Defendant's implementation of its corporate policy.

37.    Defendant had a policy of giving sales representatives within the company opportunities to generate additional income for themselves via monetary incentive contests, called "spiffs".

38.    More specifically, Defendant, via Ms. Onstad, had devised and implemented sales incentive contests called "spiffs", designed to motivate sales representatives to boost their revenues, with a monetary reward (bonus) to the sales representative who wins the contest.

39.    The Defendant's policy however, provided no guidelines to ensure that all sales representatives would be given the same opportunity to participate in the bonus incentive contests without bias or prejudice.

40.    The failure of the Defendant to promulgate written, objective guidelines in the administration of the bonus incentive contests was an invitation to engage in racial discrimination against employees of color under the guise of exercise of managerial discretion or prerogative.

41.   The failure of the Defendant to promulgate guidelines for such a situation, permitted of subjective decision-making, infected with the taint of racial prejudice on the part of personnel employed by the Defendant.

42.   An example of such a contest would be that the Defendant, would give money to sales representatives who obtained the "largest single order for any particular month".

43.   Another example of such a contest would be that the Defendant, would give money to sales representatives who obtained the "greatest amount of revenue" for any particular month.

44.   Another example of such a contest would be that the Defendant would give money to sales representatives who obtained the "greatest number of ads ordered for any particular month".

45.   On or about May of 2003, Plaintiff began to notice that the Defendant's bonus system, specifically implemented by Peggy Onstad, denied her opportunities that were being afforded to Caucasian sales representatives.

46.   At this time (May of 2003) there were approximately 13 sales representatives employed with Defendant, and three of them were specifically assigned to "telesales". All three of the telesales representatives were not of Caucasian descent, including the Plaintiff.

47.   In light of Plaintiff's relegation to classified ads, taking into consideration the characteristics of the classified ad, she was not able to take advantage of the opportunity to obtain the "largest single order for any particular month", as sales in classified ads would not generate enough revenue to become the "largest single order for any particular month".

48.    In light of Plaintiff's relegation to classified ads, taking into consideration the characteristics of the classified ad, she was not be able to take advantage of the opportunity to obtain the "greatest amount of revenue" for any particular month, as the minuscule revenue generated in classified sales put her at a distinct disadvantage in comparison to other sales representatives who sold display ads.

49.    The failure of the Defendant to promulgate written, objective guidelines before the drafting and administration of the bonus incentive contests was an invitation by Peggy Onstad to engage in racial discrimination against employees of color under the guise of exercise of managerial discretion or prerogative.

50.    The failure of the Defendant to promulgate written, objective guidelines in the drafting and administration of the bonus incentive contests did allow Peggy Onstad to discriminate against the Plaintiff by denying her the opportunity to fairly compete in the bonus incentive contests.

51.    The failure of the Defendant to promulgate written, objective guidelines in the drafting of the bonus incentive contests, coupled with Peggy Onstad's biased administration of the bonus incentive contests, had an adverse impact upon the Plaintiff.

52.    The Plaintiff was impacted adversely because she was denied opportunities to make additional income, via the Onstad "spiff" system, that were afforded her Caucasian counterparts.

53.    There were other instances where the Defendant's implementation, and/or ratification of corporate policy, reflected the racist atmosphere within the company, and which treated the Plaintiff disparately in comparison to the Caucasian sales representatives that worked for the Defendant.

8

54.    For example, at unspecified times during the day, it was not unusual for unsolicited prospects/clientele to call the Defendant, (hereinafter, "call-ins") seeking to purchase advertising space within the Defendant's newspaper.

55.    In the event of a call-in, Defendant had a policy, implemented by its managerial employees, Ms. Peggy Onstad, and Mr. John Watts, whereby it provided for all call-ins to be distributed to all of its sales representatives.

56.    The Defendant's policy however, provided no guidelines to ensure that all sales representatives would be given the same opportunity to receive call-ins without bias or prejudice.

57.    The failure of the Defendant to promulgate written, objective guidelines when distributing the call-ins that came into the office was an invitation to engage in racial discrimination against employees of color under the guise of exercise of managerial discretion or prerogative.

58.    The failure of the Defendant to promulgate guidelines for such a situation, permitted of subjective decision-making, infected with the taint of racial prejudice on the part of personnel employed by the Defendant.

59.    The failure of the Defendant to promulgate guidelines in the distribution of the call-ins, allowed Ms. Peggy Onstad, and Mr. John Watts, to specifically employ subjective decision-making, infected with the taint of racial prejudice, when engaged in the distribution of call-ins on behalf of the Defendant.

60.    Ms. Peggy Onstad did not give Plaintiff the same opportunity to receive call-ins as she gave to Caucasian sales representatives employed within the company.

61.    Mr. John Watts did not give Plaintiff the same opportunity to receive call-ins as he gave to Caucasian sales representatives employed within the company.

9

62.   Ms. Peggy Onstad did not ensure that Plaintiff would receive call-ins for display ads, that would routinely come in over the Defendant's phone lines, rather routing the call-ins to Caucasian sales representatives.

63.   Mr. John Watts did not ensure that Plaintiff would receive call-ins for display ads, that would routinely come in over the Defendant's phone lines, rather routing the call-ins to Caucasian sales representatives.

64.   Ms. Onstad's actions, as it pertained to the implementation of Defendant's policy regarding the distribution of call-ins caused Plaintiff to experience racial discrimination and prejudice, because although Plaintiff was a sales representative within the company throughout her employment, Ms. Onstad distributed a majority or disproportionate amount of the call-ins for display ads to Caucasian sales representatives.

65.   Mr. John Watts' actions, as it pertained to the implementation of Defendant's policy regarding the distribution of call-ins, caused Plaintiff to experience racial discrimination and prejudice, because although Plaintiff was a sales representative within the company throughout her employment, Mr. Watts distributed a majority or disproportionate amount of the call-ins for display ads to Caucasian sales representatives.

66.   The Defendant's denial to Plaintiff, of receiving call-ins for display ads resulted in Plaintiff's denial of opportunity for commissions.

67.   The Defendant's denial to Plaintiff, of receiving call-ins for display ads also resulted in Plaintiff being denied the opportunity to fairly compete in the monetary incentive contests ("spiffs").

68.   **The failure of the Defendant to promulgate written, objective guidelines in the**

distribution of the call-ins was an invitation by Peggy Onstad and John Watts to engage in racial discrimination against employees of color under the guise of exercise of managerial discretion or prerogative.

69. The invitation by Peggy Onstad and John Watts to engage in racial discrimination against employees of color, under the guise of exercise of managerial discretion or prerogative was accepted by them, as they specifically employed subjective decision-making, infected with the taint of racial prejudice, when engaged in the distribution of call-ins on behalf of the Defendant, to the detriment of the Plaintiff.

70. The failure of the Defendant to promulgate written, objective guidelines in the distribution of the call-ins, coupled with Peggy Onstad's and John Watts' biased distribution of the call-ins had an adverse impact upon the Plaintiff.

71. On or about October of 2003, the Plaintiff complained to the Defendant, via its employees, supervisors, and upper management, (Watts and Onstad), regarding their failure to consider her when devising the "spiffs", and for their failure to distribute call-ins to her in an amount which was proportionate to the Caucasian sales employees.

72. The Defendant did nothing to remedy the situation, but continued their disparate practices and adverse treatment of the Plaintiff.

73. Within two months after Plaintiff complained to management about the biased policies implemented within the Defendant's workplace, she was terminated, on December 11, 2003.

74. The Defendant told the Plaintiff that the reason for her termination was because they were "eliminating classified advertising in the newspaper", and that her "services were no longer needed".

11

75. The Defendant made the determination that the Plaintiff's "services were no longer needed" selling classified ads, but refused to consider keeping the Plaintiff employed selling display ads.

76. The Plaintiff inquired of the Defendant as to whether her job performance affected the Defendant's decision to terminate her, and she was specifically told by the Defendant, "no, you have been an excellent employee here".

77. The Plaintiff also asked the Defendant if she could remain in the sales department, but perform other tasks, such as continuing selling display ads, or perform field work, to which the Defendant replied, "we have no other position in our sales department, available at this time".

78. The statement told to Plaintiff by Defendant, that "we have no other positions in our sales department, available at this time", was false, as the Defendant had at least two positions available within its sales department as of December 11, 2003.

79. On or about November 20, 2003, the Defendant advertised, via the internet, job listing for "print advertising sales" within its sales department. This listing was to expire January 19, 2004.

80. On or about November 22, 2003, the Defendant advertised, via the internet, a job listing for "advertising sales" within its sales department. This listing specifically called for responsibilities in the field of advertising, as well as marketing and public relations. This listing was to expire January 21, 2004.

81. At the time the Defendant told the Plaintiff of no vacancies within its sales department, on December 11, 2003, it had not filled the "print advertising sales" position, nor had it filled the "advertising sales position"

82. At the time the Defendant told Plaintiff of no vacancies in its sales department, it knew of the two positions that it had advertised three weeks prior.

83. At the time the Defendant told Plaintiff of no vacancies in its sales department, it knew of the Plaintiff's solid performance record with the company.

84. At the time the Defendant told Plaintiff of no vacancies in its sales department, it knew of the Plaintiff's previous work experience in recruitment advertising, marketing, and public relations

85. In spite of the Defendant's knowledge of Plaintiff's work history, performance potential, and experience, Defendant lied to the Plaintiff about job opportunities within its company.

86. In spite of the Defendant's knowledge of Plaintiff's work history, performance potential, and experience, Defendant lied to the Plaintiff by not informing her about positions that it was advertising on the internet.

87. In spite of the Defendant's knowledge of Plaintiff's work history, performance potential, and experience, Defendant denied the Plaintiff the opportunity to resume working with the Defendant.

88. In essence, on December 11, 2003, the Plaintiff verbally applied for another position within the sales department of the Defendant's company, which was rejected by the Defendant.

89. Additionally, shortly after the Plaintiff's termination the Defendant decided to begin selling recruitment ads (a help wanted section) within its newspaper.

90. The Defendant knew that the Plaintiff had experience in selling recruitment ads at the time of her hire by the Defendant, and the time of her termination.

91.  In spite of the Defendant's knowledge of Plaintiff's experience in selling recruitment ads, and in spite of Plaintiff's request to be given assignments other than selling classified ads, the Defendant refused to consider the Plaintiff to sell recruitment ads for the newspaper.

92.  When the Defendant told the Plaintiff that "we have no other position in our sales department, available at this time", it knew that it had an intention to begin selling recruitment ads within its newspaper.

93.  When the Defendant told the Plaintiff that "we have no other position in our sales department, available at this time", it knew that Plaintiff had prior experience and adequate qualifications selling recruitment ads.

94.  Instead of offering the Plaintiff a position selling recruitment ads within its newspaper, the Defendant chose instead to offer the position of selling recruitment ads to a Caucasian female employee who had less experience than the Plaintiff.

95.  The Defendant did give the assignment of selling recruitment ads to a Caucasian female employee who had less experience than the Plaintiff.

96.  The Defendant made this choice to offer and give the position of selling recruitment ads to a Caucasian female employee who had less experience than the Plaintiff, because they did not want the Plaintiff working for the Defendant on account of her race.

97.  Additionally, at the time of Plaintiff's termination, there were outstanding commissions due her, on revenue generated by the Plaintiff, via the sales that she made for the partial month of December, most of which were paid for by credit card.

98.   For the month of December, the Plaintiff had a monthly sales goal in excess of
      $40,000.00, and had, by December 11, 2003, almost met her goal, generating
      revenue in excess of $30,000.00 during the first 11 days of the month of December.

99.   Plaintiff maintains that most of the revenue generated for the first 11 days of the
      month of December was paid to the Defendant via credit card, thus entitling her to a
      commission on those funds.

100.  There were also outstanding commissions due Plaintiff, on revenue generated by
      the Plaintiff, via the sales that she made for the partial month of December, which
      were collected by the Defendant after the Plaintiff was terminated.

101.  There were also outstanding commissions due Plaintiff, on revenue generated by
      her, via sales she made for future ads, and other contracted ads of 13 weeks, 26
      weeks, and 52 weeks, that had not run in the newspaper at the time of Plaintiff's
      termination, but most of which [revenue] was paid in advance by the client via
      credit-card prior to Plaintiff's termination.

102.  There were also outstanding commissions due Plaintiff, on revenue generated by
      her via sales she made for future ads, and other contracted ads of 13 weeks, 26
      weeks, and 52 weeks, that had not yet run in the newspaper at the time of Plaintiff's
      termination, but the balance of which [revenue] was collected by the Defendant
      after the Plaintiff's termination.

103.  There were also outstanding bonuses due Plaintiff, for selling ads in a holiday
      section of the Defendant's newspaper between December 1 and December 11,
      2003.

104.  On December 11, 2003, the Defendant paid the Plaintiff $1,267.67, which was to
      cover her pro-rata share for the salary she earned for the first 11 days of December,

with the balance to cover any commissions generated by the Plaintiff for those same 11 days of December.  The Plaintiff received her final paycheck on December 15, 2003, which covered salary and commissions for November 2003.

105.    As the Plaintiff had generated revenue in excess of $30,000.00 during the first 11 days of December, the Defendant has failed to pay Plaintiff commissions which she was due.

106.    As the Plaintiff had generated revenue on sales of ads that had not yet run in the newspaper as of December 11, 2003, the Defendant has failed to pay Plaintiff commissions which she was due.

107.    As the Defendant had also "collected" revenue on the sales of ads outlined in paragraphs 100-102 of the Complaint, after the Plaintiff was terminated, the Plaintiff is entitled to receive a commission on those "collected" funds, which the Defendant has refused to pay.

108.    The Defendant had also failed to pay bonuses to the Plaintiff, which were promised to the Plaintiff for selling ads in the holiday section of the Defendant's newspaper during the month of December.

109.    As a result of Defendant's failure to pay Plaintiff commissions that were due her as of December 11, 2003, the Defendant was unjustly enriched.

110.    As a result of Defendant's failure to pay Plaintiff commissions that on sales procured by her, but collected after her termination, the Defendant was unjustly enriched.

111.    Defendant has tried to assert that it owes the Plaintiff no further commission because the revenue that Plaintiff claims she is entitled to a commission was not "cash-in" as of December 11, 2003.

112.  The Plaintiff avers that all sales made via a credit-card were "cash-in" pursuant to the agreement between Plaintiff and Defendant, thus entitling her to a commission.

113.  The Plaintiff further alleges that all revenue collected after Plaintiff's termination, on sales procured by Plaintiff during her employment, would be subject to a commission in Plaintiff's favor.

114.  Moreover, the Plaintiff alleges that she would be entitled to commissions on **all** sales made by her at the time of her termination, as the Defendant has followed that practice with Caucasian sales representatives that have been terminated by the Defendant.

115.  Plaintiff alleges that for Defendant to pay other sales representative, who have been terminated by the Defendant, commissions on **all** sales made by the sales representative, and not follow the practice in her case, amounts to yet another course of disparate treatment followed by the Defendant against the Plaintiff.

116.  Further, Plaintiff alleges that the Defendant orchestrated a scheme to terminate Plaintiff on December 11, 2003, so as to claim that her sales made for the month of December, (and for future ads not yet run in the newspaper) were not "cash-in" at the time of her termination.

117.  Plaintiff alleges that Defendant terminated Plaintiff on December 11, 2003, so as to try and avoid paying Plaintiff commissions that were due her.

118.  Plaintiff alleges that the Defendant's termination of Plaintiff on December 11, 2003, so as to try and avoid paying commissions that were due her amounted to bad faith.

119.  Plaintiff alleges that the Defendant's decision to terminate Plaintiff on December 11, 2003, allowed the Defendant to become unjustly enriched, as it deprived the Plaintiff to obtain commissions for sales made by her for the Defendant.

120.  Plaintiff alleges that the Defendant terminated Plaintiff in order to avoid its'
obligation in paying the Plaintiff commissions that she earned, through services that
she already rendered to the Defendant.

121.  Plaintiff alleges that the Defendant terminated Plaintiff in order to avoid its'
obligation in paying the Plaintiff commissions that she almost earned, on revenue
collected by the Defendant after Plaintiff's termination, through services that she
already rendered to the Defendant.

122.  Additionally, Plaintiff was entitled, pursuant to the agreement with her employer,
that she would be entitled to payment of unused vacation time.

123.  The Plaintiff had accrued approximately 8 days of vacation time from April 3,
2002, to December 11, 2003.

124.  As of December 11, 2003, the Plaintiff took full vacation days on August 29,
September 7, November 26, and November 8, 2003.  Plaintiff also took half-days of
vacation on November 13, and November 25, 2003.  Plaintiff also took 2 hours of
vacation on October 10, 2003.

125.  As of December 11, 2003, the Plaintiff had used approximately five days and two
hours to be applied against the 8 days of vacation time that she had accrued up to
the date of her termination, leaving approximately 2 days and 6 hours of vacation
time that Plaintiff is entitled to compensation.

126.  Defendant refused to compensate Plaintiff for her unused vacation time.

127.  Further, on December 3, 2003, the Plaintiff applied to the Defendant's 401 K plan.
The Plaintiff specifically left the application with Mr. Rick Stoehrer, the person
who administers the plan for the Defendant.

18

128.  Plaintiff's understanding was that after the application was processed, the first contribution to the plan was to be deducted from the next paycheck she would receive, which in the present instance would have been on December 15, 2003.

129.  The Defendant did not process the 401 K application submitted by the Plaintiff on December 3, 2003.

130.  The Plaintiff inquired of Mr. Rick Stoehrer, who was the office manager employed by the Defendant at the time, shortly after she submitted the 401 K application, if it was processed.

131.  Mr. Stoehrer indicated to Plaintiff that he did not have the application, as he lost it.

132.  Plaintiff complained to Peggy Onstad about her "lost" 401K application, and Onstad told Plaintiff she would speak to Mr. Stoehrer, and subsequently the application was found prior to Plaintiff's termination of December 11, 2003.

133.  Even though the Plaintiff's 401K application was found prior to her termination, the application was not processed by the Defendant prior to her termination.

134.  After the Defendant terminated the Plaintiff on December 11, 2003, the Defendant gave the Plaintiff one paycheck for payment for services rendered in the month of December on December 11, 2003.

135.  The Defendant gave the Plaintiff another paycheck for payment for services rendered in the month of November on December 15, 2003.

136.  The Defendant did not use any of the funds tendered to the Plaintiff on December 11, 2003 to fund the 401K plan.

137.  The Defendant did not use any of the funds tendered to the Plaintiff on December 15, 2003, to fund the 401 K plan.

19

138.  As a result of the Defendant's actions, the Plaintiff was unable to take advantage of the 401K plan offered by the Defendant.

139.  After the Plaintiff's termination by the Defendant, the Defendant filled the positions that were advertised by the internet for "print advertising sales" and "advertising sales".

140.  After the Plaintiff's termination by the Defendant, the Defendant filled the positions that were advertised via the internet for "print advertising sales" and "advertising sales" with persons of Caucasian descent.

141.  After the Plaintiff's termination by the Defendant, the Defendant filled the positions that were advertised via the internet for "print advertising sales" and advertising sales" with person of Caucasian descent, who were either equal to Plaintiff, or less than Plaintiff, in terms of qualifications.

142.  After the Plaintiff's termination by the Defendant, and after Plaintiff specifically expressed a desire to remain employed selling ads for the Defendant in its sales department, the Defendant offered the opportunity to sell recruitment ads to a person of Caucasian descent, a person who had less experience than Plaintiff in selling recruitment ads.

143.  On December 16, 2004, the Plaintiff filed an action for discrimination against the Massachusetts Commission against Discrimination.

144.  As a direct proximate result of the Defendant's denial of Plaintiff's commissions and bonuses that she was due at the time of her termination, Plaintiff has been caused to suffer great pain in body and mind, has been damaged professionally, has been prevented from transacting her business, and has been otherwise damaged.

145.  As a direct and proximate result of the Defendant's denial of Plaintiff's commissions on collected revenue after her termination, Plaintiff has been caused to suffer great pain in body and mind, has been damaged professionally, has been prevented from transacting her business, and has been otherwise damaged.

146.  As a direct proximate result of the Defendant's failure to pay Plaintiff for all accrued vacation time at her termination, caused Plaintiff to suffer great pain in body and mind, and has been prevented from transacting her business, and has been otherwise damaged.

147.  As a direct proximate result of the Defendant's failure to submit her application to be enrolled in the Defendant's 401K plan, caused Plaintiff to suffer great pain in body and mind, and has been prevented from transacting her business, and has been otherwise damaged.

148.  As a direct proximate result of the Defendant's failure to deny her verbal application for other sales positions within the company, the Plaintiff was caused to suffer great pain in body and mind, and has been prevented from transacting her business, and has been otherwise damaged.

149.  As a direct proximate result of the false information that Defendant told Plaintiff, that they had no open positions within their sales department, caused Plaintiff to forgo submitting a written application to the Defendant to fill any open positions, and caused her to be denied an opportunity to resume her employment with the Defendant.

150.  As a direct proximate result of Defendant's denial of an opportunity to Plaintiff to resume her employment with the Defendant, caused Plaintiff to suffer great pain in

21

body and mind, and has been prevented from transacting her business, and has been otherwise damaged.

151.  As a direct proximate result of the Defendant's hire of two white employees to fill the positions that a employee like Plaintiff was qualified for, and verbally applied for, caused Plaintiff to suffer great pain in body and mind, and has been prevented from transacting her business, and has been otherwise damaged.

152.  As a direct proximate result of the Defendant's failure to include Plaintiff in the "spiffs", that were granted to other white sales representatives, caused Plaintiff to suffer great pain in body and mind, and has been prevented from transacting her business, and has been otherwise damaged.

153.  As a direct proximate result of the Defendant's failure to distribute a fair share of call-ins to the Plaintiff, rather to show a bias to white sales representatives, by giving them a disproportionately greater amount of call-ins, caused Plaintiff to suffer great pain in body and mind, and has prevented her from transacting her business, and has been otherwise damaged.

154.  Plaintiff interpreted this Defendant's actions towards Plaintiff to be a measure of Defendant's antipathy towards her because she was a person of color.

155.  The Defendant had a policy that its employees could meet with management in order to attempt to eliminate interpersonal difficulties and to improve job performance and promote harmony between supervisor and supervisee.

156.  In keeping with this policy, Plaintiff has met with supervisory officials employed by the Defendant during her employment to protest against bias and disparate treatment she received in relation to white sales representatives, all the while placing the Defendant on notice as to their discriminatory practices.

157.    The Defendant has either refused or failed to address her concerns so as to remedy the discriminatory practices applied against him throughout her employment, in violation of company policy.

158.    As a direct and proximate result of the discriminatory treatment described above, to which the Defendant's supervisors and other personnel subjected Plaintiff, and of the separate impact of alleged facially neutral employment practices and policies, above described, Plaintiff was harmed physically, emotionally, professionally, and financially.

159.    The discriminatory practices described above, are not job related and are not necessary for the transaction of the business of the Defendant.

160.    All conditions precedent to the filing of this action have occurred and/or have been fulfilled.

**161.**    The reasons offered by defendant for any action taken against the Defendant are a pretext for discrimination.

### CLAIMS FOR RELIEF

### COUNT 1:

### EMPLOYMENT DISCRIMINATION – WRONGFUL TERMINATION, DISPARATE TREATMENT and ADVERSE EMPLOYMENT ACTION IN VIOLATION OF MASS GEN. LAWS. CHAP. 151B

**162.**    Plaintiff repeats and re-avers all of the averments of paragraphs 1 through 161 with the same force and effect as if fully set forth herein.

163.    Defendant is an "employer" within the meaning of Mass.Gen.L. c. 151B, § 1(5).

164.    Plaintiff is an "employee" within the meaning of Mass.Gen.L. c. 151B, § 1(6), and a racial minority within the meaning of Mass.Gen.L. c. 151B.

165.    Defendant violated plaintiff's rights secured by G.L. c.151B §4, by the Defendant's disparate treatment, taken against the Plaintiff as described in the aforementioned paragraphs, said actions causing damage to Plaintiff's body, and mind, as well as preventing her from transacting her business, and has otherwise caused her damage.

166.    Defendant violated plaintiff's rights secured by G.L. c.151B §4, by the Defendant's adverse actions, taken against Plaintiff's status of employment, as described in the aforementioned paragraphs, said actions causing damage to Plaintiff's body, and mind, as well as preventing her from transacting her business, and has otherwise caused her damage.

167.    Defendant violated plaintiff's rights secured by G.L. c.151B §4, by the Defendant's actions, in rejecting Plaintiff, who was a qualified applicant, seeking a sales position within the Defendant's company, rather continuing their solicitation of applicants, and hiring persons with less qualifications than the Plaintiff, as described in the aforementioned paragraphs, said actions causing damage to Plaintiff's body, and mind, as well as preventing her from transacting her business, and has otherwise caused her damage.

168.    Defendant violated plaintiff's rights secured by G.L. c.151B §4, by the Defendant's actions, in refusing to consider Plaintiff, who was a qualified applicant, seeking to sell recruitment ads within the Defendant's company, rather offering the opportunity to sell recruitment ads to a person with less experience and qualification than Plaintiff, as described in the aforementioned paragraphs, said actions causing damage to Plaintiff's body, and mind, as well as preventing her from transacting her business, and has otherwise caused her damage.

## COUNT 2:

## BREACH OF CONTRACT -- COMMISSIONS

169. Plaintiff repeats and re-avers all of the averments of paragraphs 1 through 168 with the same force and effect as if fully set forth herein.

170. During the course of Plaintiff's employ with Defendant, Defendant promised her that in exchange for her employment, she would be paid a 10% commission on **all collected** sales procured by her over $17,110.00, and 15% over $25,000.00.

171. There was nothing in the agreement that limited the term "collected" sales to sales that were collected while Plaintiff was still employed with the Defendant.

172. The verbal and written promises exchanged between the Plaintiff and Defendant, as it related to how Plaintiff would be paid a commission amounted to a binding contract between the parties.

173. Between December 1, 2003, and December 11, 2003, Plaintiff procured sales in excess of $30,000.00, most of which was paid by credit card, and collected by the Defendant.

174. Also Plaintiff procured sales for future ads, paid for by credit-card, which were collected by the Defendant, which had not yet run in the newspaper at the time of her termination.

175. Further Plaintiff procured sales for ads whose revenue was collected by the Defendant after the Plaintiff was terminated.

176. Defendant never paid the Plaintiff the full amount of the commission owed to her for sales procured between December 1, 2003 and December 11, 2003.

177. Defendant never paid the Plaintiff the full amount of the commission owed to her for her procured sales for the future ads.

25

178. Defendant never paid the Plaintiff the full amount of the commission owed to her for her procured sales, whose revenue was collected by the Defendant after she was terminated.

179. Defendant breached the terms of the agreement of the contract it had with the Plaintiff, in that they refused to pay commissions due her on sales procured and collected revenue between December 1, 2003 and December 11, 2003.

180. Defendant breached the terms of the agreement of the contract it had with the Plaintiff, in that they refused to pay commissions due her for sales on future ads, that were collected by the Defendant before and after she was terminated.

181. Said breaches have harmed the Plaintiff professionally, has prevented the Plaintiff from transacting her business, has caused her financial damage, and has damaged her otherwise.

## COUNT 3:

## BREACH OF CONTRACT -- BONUSES

182. Plaintiff repeats and re-avers all of the averments of paragraphs 1 through 181 with the same force and effect as if fully set forth herein.

183. During the course of Plaintiff's employ with Defendant, Defendant promised her that in exchange for her employment, she would be paid a bonus for her performance on selling ads within the holiday section of the Defendant's newspaper between December 1 and December 11, 2003.

184. The promises exchanged between the Plaintiff and Defendant amounted to a binding contract between the parties.

185. Between December 1, 2003, and December 11, 2003, Plaintiff performed her work, selling ads within the holiday section of the Defendant's newspaper to a level which entitled her to a bonus as promised to the Plaintiff for her effort.

186. Defendant never paid the Plaintiff the bonus owed to her for her performance selling holiday ads December 1, 2003 and December 11, 2003.

187. Defendant breached the terms of the agreement of the contract it had with the Plaintiff, by not paying the Plaintiff the bonus owed to her.

**188.** Said breach has harmed the Plaintiff professionally, has prevented the Plaintiff from transacting her business, has caused her financial damage, and has damaged her otherwise.

## COUNT 4:

## BREACH OF CONTRACT – VACATION TIME

189. Plaintiff repeats and re-avers all of the averments of paragraphs 1 through 188 with the same force and effect as if fully set forth herein.

190. During the course of Plaintiff's employ with Defendant, Defendant promised her that in exchange for her employment, she would accrue vacation time at the rate of .4 days a month, and that she would be entitled to receive the vacation pay should her employment with the Defendant cease.

191. The promises exchanged between the Plaintiff and Defendant amounted to a binding contract between the parties.

192. Between April 3, 2002, and December 11, 2003, Plaintiff accrued approximately 8 days in vacation time.

193. Between April 3, 2002, and December 11, 2003, Plaintiff used approximately 5 days, and 2 hours worth of accrued vacation time.

194.    The Defendant owes the Plaintiff approximately 2 days and 6 hours worth of vacation time, which the Defendant has refused to pay.

195.    Defendant's refusal to pay Plaintiff for unused vacation time is a breach of the agreement it had with the Plaintiff regarding unused vacation time.

196.    Said breach has harmed the Plaintiff professionally, has prevented the Plaintiff from transacting his business, has caused her financial damage, and has damaged her otherwise.

### COUNT 5:

### BREACH OF CONTRACT- 401K PLAN

197.    Plaintiff repeats and re-avers all of the averments of paragraphs 1 through 196 with the same force and effect as if fully set forth herein.

198.    During the course of Plaintiff's employ with Defendant, Defendant promised her that in exchange for her employment, she would be able to take advantage of the Defendant's 401K plan.

199.    All the Plaintiff needed to do to take advantage of the 401K plan promised by the Defendant was to submit an application, where the Defendant promised it would process it, and fund the Plan with the first paycheck received after the application had been processed.

200.    The promises exchanged between Plaintiff and Defendant amounted to a binding contract between the parties.

201.    On December 3, 2003, the Plaintiff submitted an application to the Defendant for processing in order for her to take advantage of the 401K plan.

202.    The Defendant never processed the application, on December 3, 2003, and terminated the Plaintiff on December 11, 2003.

203.  The Defendant breached the promise that it made with the Plaintiff to process the application.

204.  Said breach has harmed the Plaintiff professionally, has prevented the Plaintiff from transacting her business, has caused her financial damage, and has damaged her otherwise.

## COUNT 6:

## BREACH OF CONTRACT- MONEY HAD AND RECEIVED, THE DEFENDANT'S UNJUST ENRICHMENT

205.  Plaintiff repeats and re-avers all of the averments of paragraphs 1 through 204 with the same force and effect as if fully set forth herein.

206.  The Plaintiff's employment at-will with the Defendant carried with it an agreement that Defendant would pay Plaintiff a commission on all revenue regarding sales made by the Plaintiff, and collected by the Defendant.

207.  The Plaintiff's employment at-will with the Defendant carried with it an agreement that should the Defendant collect revenue regarding sales made by the Plaintiff during her employment, but collected after she was terminated, then equity and good conscience would require that Defendant pay the Plaintiff a commission on said revenue.

208.  For the Defendant to retain a commission owed to the Plaintiff, in connection with any sale made by the Plaintiff during her employment, would unjustly enrich the Defendant to the detriment of the Plaintiff.

209.  After the Defendant's termination of the Plaintiff on December 11, 2003, it has retained commissions owed to the Plaintiff, regarding sales she made during her employment, and has been unjustly enriched to the detriment of the Plaintiff, and constitutes breach of contract.

29

210.    Said breach has harmed the Plaintiff professionally, has prevented the Plaintiff from

transacting her business, has caused her financial damage, and has damaged her

otherwise.

## COUNT 7:

## BREACH OF CONTRACT- VIOLATION OF THE IMPLED COVENANT OF GOOD FAITH AND FAIR DEALING

211.    Plaintiff repeats and re-avers all of the averments of paragraphs 1 through 210 with

the same force and effect as if fully set forth herein.

212.    The Plaintiff's employment at will with the Defendant carried with it an implied

covenant of good faith and fair dealing, which promised the Plaintiff that she would

not be terminated in order to avoid payment of compensation earned by her through

services already rendered to the employer.

213.    The Plaintiff's employment at will with the Defendant carried with it an implied

covenant of good faith and fair dealing, which promised the Plaintiff that she would

not be terminated in order to avoid payment of compensation almost earned by her

through services already rendered to the employer.

214.    The termination of the Plaintiff's employment for the reasons described in

paragraphs 212 and 213, amounts to a termination in bad-faith, and a breach of

contract.

215.    The Defendant's termination of Plaintiff on December 11, 2003, was made in bad

faith as it was done in order to avoid payment of compensation either earned by her,

or almost earned by her through services already rendered to the employer.

216.    The Defendant's termination of Plaintiff on December 11, 2003, caused the

Defendant to become unjustly enriched.

30

217.    The Defendant's termination of Plaintiff on December 11, 2003, is a violation of the implied covenant of good faith and fair dealing, and is a breach of contract.

218.    Said breach has harmed the Plaintiff professionally, has prevented the Plaintiff from transacting her business, has caused her financial damage, and has damaged her otherwise.

WHEREFORE, plaintiff prays that this Court:

1.    Award compensatory damages to plaintiff;

2.    Award punitive damages against defendant;

3.    Award Plaintiff all outstanding commissions owed to her;

4.    Award Plaintiff all outstanding bonuses owed to her;

5.    Award Plaintiff all back-pay, and front-pay.

6.    Award costs and reasonable attorney's fees; and

7.    Grant such other and further relief which may be appropriate and/or necessary.

**PLAINTIFF DEMANDS TRIAL BY JURY**

ANNETTE HARDING,
By her attorney,

Gordon W. Spencer, Esq.
1256 Park Street, Suite 104
Stoughton, MA 02072
(781) 297-9293

. HEREBY ATTEST AND CERTIFY ON
MARCH 25, 2005, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

ASSISTANT CLERK.

31

COMMONWEALTH OF MASSACHUSETTS                    SUFFOLK, SS

I, Annette Harding, having been sworn, depose and say that I am the plaintiff in the foregoing action, that I have read the averments of the complaint and that they are true of my knowledge.


_Annette Harding_
Annette Harding
February 14 2005

Signed and sworn to before me this _14th_ day of February, 2005.


_Pierre Richard J. Cornely_
Notary Public
My Commission expires: _2/2008_

32