## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

### Civil action no.:  05-10576-GAO

| | |
|---|---|
| **ANNETTE HARDING,** | ) |
| **Plaintiff.** | ) |
| **v.** | ) |
| | ) |
| **BOSTON METRO PUBLISHING** | ) |
| **Defendant.** | ) |
| | ) |
| | ) |

## MOTION OF PLAINTIFF TO AMEND COMPLAINT BY REMOVING COUNT FIVE (V) AND REMAND TO SUPERIOR COURT

Now comes the Plaintiff in the above-action, pursuant to F.R.C.P. 15 and moves this Honorable Court to amend the herein complaint to remove the remaining elements/count of Count V (Breach of Contract 401K plan) and further remand said action to Superior Court for adjudication.

In support of said motion, Plaintiff states the following:

1.    On or about February 16, 2005, the Plaintiff filed the herein action in Suffolk Superior Court, Civil Action No.: 05-0617G.  The gravamen of Plaintiff's action is grounded in employment discrimination based upon race.

2.    On or about March 24, 2005, the Defendant removed to this court on grounds of Erisa/Federal Question, citing that Count V *either*, states a claim of denial of benefits under a pension plan under Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), *or*, states a claim of alleged failures or omissions in

the administration of a pension plan under Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3).

3. In review of Count V of Plaintiff's Verified Complaint, she has alleged that her employer failed to enroll her in the Defendant's 401K plan, after they promised to do so, an allegation sounding in breach of contract.

4. Upon belief of the Plaintiff, the Defendant has taken Count V and fashioned two theoretical claims upon which Plaintiff relies to seek relief, with the intention of invoking this court's original jurisdictional powers.

5. This became readily apparent at a Status Conference before this Court on August 3, 2005, where the Defendant was still unsure as to what scripture and verse of ERISA would apply to the facts of this case.

6. The Plaintiff has, and continues to maintain that the crux of this case is not about ERISA but whether the Defendant has taken adverse employment actions against the Plaintiff on account of her race.

7. In the interests of litigious economy, so as not to be distracted by issues secondary or even tertiary in this case, Plaintiff seeks to streamline her case to keep the Defendant focused on her primary cause of action, by amending her complaint to dismiss Count V.

8. A District Court may decline adjudication of lingering state law claims after it has dismissed "all claims over which it has original jurisdiction". Roche v. John Hancock Mutual Life Ins. Co., 81 F.3d 249, 256-57 (1st Cir. 1996), citing 28 U.S.C. §1367(c)(3).

9.    Further, when making the decision to decline supplemental jurisdiction, the trial court "must take into account concerns of comity, judicial economy, convenience, fairness and the like. Roche 81 F.3d at 257.

10.    There has been no discovery exchanged to date, and neither party would be prejudiced by the amendment.

11.    Plaintiff thus desires to amend her complaint to dismiss Count V and advance the balance of her claims upon state law in Superior Court (see attached complaint).

**WHEREFORE**, Plaintiff moves this honorable court for an order amending the complaint by removing Count V in its entirety and remand said complaint back to Superior Court.

ANNETTE HARDING,
By her attorney,

Gordon W. Spencer, Esq.
1256 Park Street, Suite 104
Stoughton, MA 02072
(781) 297-9293

October 7, 2005

### CERTIFCATE OF SERVICE

I hereby certify that I have served a copy of the above document, upon the Defendant, by and to their Attorney, Mr. Erik Winton, of Jackson Lewis, LLP, 75 Park Plaza, Boston, MA 02116, via first-class mail, postage prepaid.

Gordon W. Spencer

October 7, 2005

3

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

FILED
RKS OFFICE

05 OCT 11  P 2: 31

U.S. DISTRICT COURT
DISTRICT OF MASS.

**CIVIL ACTION NO.: 05-10576-GAO**

| | |
|---|---|
| ANNETTE HARDING, | ) |
| Plaintiff. | ) |
| v. | ) |
| | ) |
| BOSTON METRO PUBLISHING | ) |
| Defendant. | ) |
| | ) |
| | ) |

### PLAINTIFF'S FIRST AMENDED COMPLAINT

### I.       PARTIES

1.    Plaintiff is a black female citizen of the United States living at 9 Edwin St. #2,

Boston, County of Suffolk, Massachusetts.

2.    Boston Metro Publishing is a corporation duly organized and doing business

under the laws of the Commonwealth of Massachusetts. Defendant maintains a

place of business at 320 Congress Street, Boston, County of Suffolk,

Massachusetts.

### II.      FACTUAL ALLEGATIONS

3.    The Defendant's business consists of publishing and distributing the

5- day-a week newspaper, *Boston Metro*. The newspaper is distributed free of

charge, and contains relatively short articles encapsulating the news of the day

and is designed to be read quickly by commuters. The length of each day's issue

1

is strictly limited to 40 pages, of which no more than 50 percent is advertising, which accounts for 100% of the company's total revenue.

4.     The ads are sold on the basis of size, with the larger ads priced higher than the smaller ones.

5.     The ads could also be categorized into "display ads" and "classified ads". Display ads are much larger than classified ads, and would generate more revenue than its smaller counterpart.

6.     The Plaintiff was hired under a contract at-will by the Defendant, to start work on April 3 2002, as a telesales representative, in the Defendant's sales department.

7.     One of the responsibilities of a telesales representative was to solicit advertising space within the Defendant's newspaper.

8.     On the same day of April 3, 2002, the Defendant and Plaintiff entered into a written agreement (hereinafter "the agreement") which outlined the terms and conditions of her at-will employment with the Defendant.

9.     More specifically, the agreement stated that Plaintiff's specific responsibilities were to include making sales calls to prospects across all categories with a minimum of twenty-five calls per day, tracking advertising orders into the computer system, report status and outcome to the sales, and to perform such other duties as the Defendant may assign.

10.    At the time of her hire, the Defendant promised the Plaintiff, as stated in the agreement, that in exchange for her employment with the company, she would get paid 26 thousand dollars per annum, plus a 10% commission on all "collected sales", (hereinafter, "cash-in" sales), if said amount exceeded $17,110.00 (9%

2

commission if said amount did not exceed $17,110.00), and a 15% commission on revenue sales over $25,000.00 per month.

11.   The agreement also contained an implied covenant of good faith and fair dealing, that Plaintiff would not be terminated in order to avoid Defendant's obligation in paying the Plaintiff commissions that she earned, or almost earned, through services that she already rendered to the Defendant.

12.   The Defendant also admits that Plaintiff would not be terminated in order to avoid its obligation to pay the Plaintiff commission that she earned, through services that she already rendered to the Defendant.

13.   The Defendant further admits that Plaintiff would not be terminated in order to avoid its obligation to pay the Plaintiff commission that she almost earned, through services that she already rendered to the Defendant.

14.   The agreement also was silent as to Plaintiff's entitlement to any commission on sales generated by the Plaintiff, but "collected" by the Defendant, after the Plaintiff's employment with the Defendant had ceased.

15.   Defendant also promised Plaintiff that she would accrue vacation time at a rate of .4 days a month, and that in exchange for her employment with the company, she would be entitled to receive all unused vacation time, once her employment with the Defendant had ceased.

16.   At the beginning of her employment with the Defendant, Plaintiff was assigned to sell display ads. The Plaintiff excelled at her position.

3

17.  After the passage of time, however, and in spite of Plaintiff's superior job performance in selling display ads, Defendant altered Plaintiff's job responsibilities within the sales department to selling mostly classified ads.

18.  Even though the Plaintiff's job responsibilities were modified, the Plaintiff still remained a sales representative within the Defendant's company, and the Plaintiff was still authorized to sell display ads for the Defendant.  The Defendant merely instructed the Plaintiff to devote more time to selling classified ads.

19.  Classifieds were billed at a flat rate of $29.00 per ad, a significantly lesser amount than the cost of display ads, and did not provide much opportunity to maximize the potential for lucrative commissions.

20.  The Plaintiff interpreted the Defendant's modification in her job responsibility as a

     demotion, as she now had to work much harder in order to obtain commissions commensurate with what she had received selling mostly display ads.

21.  Notwithstanding the modification in job responsibility, however, Plaintiff was committed to a long-term relationship with Defendant, was seeking to maintain employment within the Defendant's sales department indefinitely.

22.  Once the Defendant modified the Plaintiff's job responsibilities, by instructing her to devote more of her time selling classified ads, Plaintiff performed her job in selling classified ads with diligence and superiority.

23.  Plaintiff would usually sell the classified ads via the telephone, where the client would routinely pay the price of the advertising space via a credit card.

4

24.     Plaintiff avers that as soon as the client would pay the price of the advertising space via a credit card, the transaction would be considered "cash-in", entitling her to a commission on that transaction.

25.     Defendant also admits that as soon as the client would pay the price of the advertising space via a credit card, said transaction would be considered "cash-in", entitling the sales representative to a commission on that transaction.

26.     Defendant admits that their policy of entitling their sales representatives to a commission on advertising space paid by credit card was carried out in practice, as Plaintiff would promptly receive commissions on sales of advertising space paid by credit card.

27.     Defendant admits that their policy of entitling their sales representatives to a commission on advertising space paid by credit card was promised to the Plaintiff in exchange for her employment.

28.     Defendant has a policy by which it binds itself to observe fair employment practices, and pledges not to discriminate against its employees in the terms and conditions of employment on account of race, color, and national origin.

29.     The terms and provisions of the policy defined in paragraph 28 have become part of the terms of the contract of employment between Plaintiff and Defendant, and Plaintiff relied on such terms during her employment with Defendant.

30.     Employees of color, such as Plaintiff, were the intended beneficiaries of the provisions of the Defendant's policy delineated in Paragraph 28.

31.     At the time of Plaintiff's hire, the Defendant was aware of Plaintiff's prior work history in sales and advertising.

32. At the time of Plaintiff's hire, the Defendant knew that from 1996 to 2001, Plaintiff was employed by the Community Newspaper Company in Needham, MA, a company owned by the Boston Herald.

33. Defendant's knowledge of Plaintiff's previous employment with Community Newspaper Company also included that Plaintiff's initial job title was, "classified advertising sales representative", whereafter she was promoted to, "recruitment display advertising sales representative" within that company.

34. Defendant was also aware at the time they hired Plaintiff that she had marketing and public relations experience while working for Community Newspaper Company.

35. On or about November of 2002, Ms. Peggy Onstad joined the Defendant's company (Boston Metro) as its Vice President of Sales, Marketing and Promotions.

36. Soon after Onstad's arrival, the Plaintiff began experiencing what she characterizes as a "racist atmosphere" within the work place, demonstrated specifically by the Defendant's disparate treatment of her, via the Defendant's implementation of its corporate policy.

37. Defendant had a policy of giving sales representatives within the company opportunities to generate additional income for themselves via monetary incentive contests, called "spiffs".

38. More specifically, Defendant, via Ms. Onstad, had devised and implemented sales incentive contests called "spiffs", designed to motivate sales representatives to

6

boost their revenues, with a monetary reward (bonus) to the sales representative who wins the contest.

39. The Defendant's policy however, provided no guidelines to ensure that all sales representatives would be given the same opportunity to participate in the bonus incentive contests without bias or prejudice.

40. The failure of the Defendant to promulgate written, objective guidelines in the administration of the bonus incentive contests was an invitation to engage in racial discrimination against employees of color under the guise of exercise of managerial discretion or prerogative.

41. The failure of the Defendant to promulgate guidelines for such a situation, permitted of subjective decision-making, infected with the taint of racial prejudice on the part of personnel employed by the Defendant.

42. An example of such a contest would be that the Defendant, would give money to sales representatives who obtained the "largest single order for any particular month".

43. Another example of such a contest would be that the Defendant, would give money to sales representatives who obtained the "greatest amount of revenue" for any particular month.

44. Another example of such a contest would be that the Defendant would give money to sales representatives who obtained the "greatest number of ads ordered for any particular month".

45. On or about May of 2003, Plaintiff began to notice that the Defendant's bonus system, specifically implemented by Peggy Onstad, denied her opportunities that were being afforded to Caucasian sales representatives.

46. At this time (May of 2003) there were approximately 13 sales representatives employed with Defendant, and three of them were specifically assigned to "telesales". All three of the telesales representatives were not of Caucasian descent, including the Plaintiff.

47. In light of Plaintiff's relegation to classified ads, taking into consideration the characteristics of the classified ad, she was not able to take advantage of the opportunity to obtain the "largest single order for any particular month", as sales in classified ads would not generate enough revenue to become the "largest single order for any particular month".

48. In light of Plaintiff's relegation to classified ads, taking into consideration the characteristics of the classified ad, she was not be able to take advantage of the opportunity to obtain the "greatest amount of revenue" for any particular month, as the minuscule revenue generated in classified sales put her at a distinct disadvantage in comparison to other sales representatives who sold display ads.

49. The failure of the Defendant to promulgate written, objective guidelines before the drafting and administration of the bonus incentive contests was an invitation by Peggy Onstad to engage in racial discrimination against employees of color under the guise of exercise of managerial discretion or prerogative.

50. The failure of the Defendant to promulgate written, objective guidelines in the drafting and administration of the bonus incentive contests did allow Peggy

8

Onstad to discriminate against the Plaintiff by denying her the opportunity to fairly compete in the bonus incentive contests.

51. The failure of the Defendant to promulgate written, objective guidelines in the drafting of the bonus incentive contests, coupled with Peggy Onstad's biased administration of the bonus incentive contests, had an adverse impact upon the Plaintiff.

52. The Plaintiff was impacted adversely because she was denied opportunities to make additional income, via the Onstad "spiff" system, that were afforded her Caucasian counterparts.

53. There were other instances where the Defendant's implementation, and/or ratification of corporate policy, reflected the racist atmosphere within the company, and which treated the Plaintiff disparately in comparison to the Caucasian sales representatives that worked for the Defendant.

54. For example, at unspecified times during the day, it was not unusual for unsolicited prospects/clientele to call the Defendant, (hereinafter, "call-ins") seeking to purchase advertising space within the Defendant's newspaper.

55. In the event of a call-in, Defendant had a policy, implemented by its managerial employees, Ms. Peggy Onstad, and Mr. John Watts, whereby it provided for all call-ins to be distributed to all of its sales representatives.

56. The Defendant's policy however, provided no guidelines to ensure that all sales representatives would be given the same opportunity to receive call-ins without bias or prejudice.

57. The failure of the Defendant to promulgate written, objective guidelines when

9

distributing the call-ins that came into the office was an invitation to engage in racial discrimination against employees of color under the guise of exercise of managerial discretion or prerogative.

58.    The failure of the Defendant to promulgate guidelines for such a situation, permitted of subjective decision-making, infected with the taint of racial prejudice on the part of personnel employed by the Defendant.

59.    The failure of the Defendant to promulgate guidelines in the distribution of the call-ins, allowed Ms. Peggy Onstad, and Mr. John Watts, to specifically employ subjective decision-making, infected with the taint of racial prejudice, when engaged in the distribution of call-ins on behalf of the Defendant.

60.    Ms. Peggy Onstad did not give Plaintiff the same opportunity to receive call-ins as she gave to Caucasian sales representatives employed within the company.

61.    Mr. John Watts did not give Plaintiff the same opportunity to receive call-ins as he gave to Caucasian sales representatives employed within the company.

62.    Ms. Peggy Onstad did not ensure that Plaintiff would receive call-ins for display ads, that would routinely come in over the Defendant's phone lines, rather routing the call-ins to Caucasian sales representatives.

63.    Mr. John Watts did not ensure that Plaintiff would receive call-ins for display ads, that would routinely come in over the Defendant's phone lines, rather routing the call-ins to Caucasian sales representatives.

64.    Ms. Onstad's actions, as it pertained to the implementation of Defendant's policy regarding the distribution of call-ins caused Plaintiff to experience racial discrimination and prejudice, because although Plaintiff was a sales representative

within the company throughout her employment, Ms. Onstad distributed a majority or disproportionate amount of the call-ins for display ads to Caucasian sales representatives.

65. Mr. John Watts' actions, as it pertained to the implementation of Defendant's policy regarding the distribution of call-ins, caused Plaintiff to experience racial discrimination and prejudice, because although Plaintiff was a sales representative within the company throughout her employment, Mr. Watts distributed a majority or disproportionate amount of the call-ins for display ads to Caucasian sales representatives.

66. The Defendant's denial to Plaintiff, of receiving call-ins for display ads resulted in Plaintiff's denial of opportunity for commissions.

67. The Defendant's denial to Plaintiff, of receiving call-ins for display ads also resulted in Plaintiff being denied the opportunity to fairly compete in the monetary incentive contests ("spiffs").

68. The failure of the Defendant to promulgate written, objective guidelines in the distribution of the call-ins was an invitation by Peggy Onstad and John Watts to engage in racial discrimination against employees of color under the guise of exercise of managerial discretion or prerogative.

69. The invitation by Peggy Onstad and John Watts to engage in racial discrimination against employees of color, under the guise of exercise of managerial discretion or prerogative was accepted by them, as they specifically employed subjective decision-making, infected with the taint of racial prejudice, when engaged in the

11

distribution of call-ins on behalf of the Defendant, to the detriment of the Plaintiff.

70.  The failure of the Defendant to promulgate written, objective guidelines in the distribution of the call-ins, coupled with Peggy Onstad's and John Watts' biased distribution of the call-ins had an adverse impact upon the Plaintiff.

71.  On or about October of 2003, the Plaintiff complained to the Defendant, via its employees, supervisors, and upper management, (Watts and Onstad), regarding their failure to consider her when devising the "spiffs", and for their failure to distribute call-ins to her in an amount which was proportionate to the Caucasian sales employees.

72.  The Defendant did nothing to remedy the situation, but continued their disparate practices and adverse treatment of the Plaintiff.

73.  Within two months after Plaintiff complained to management about the biased policies implemented within the Defendant's workplace, she was terminated, on December 11, 2003.

74.  The Defendant told the Plaintiff that the reason for her termination was because they were "eliminating classified advertising in the newspaper", and that her "services were no longer needed".

75.  The Defendant made the determination that the Plaintiff's "services were no longer needed" selling classified ads, but refused to consider keeping the Plaintiff employed selling display ads.

76.   The Plaintiff inquired of the Defendant as to whether her job performance affected the Defendant's decision to terminate her, and she was specifically told by the Defendant, "no, you have been an excellent employee here".

77.   The Plaintiff also asked the Defendant if she could remain in the sales department, but perform other tasks, such as continuing selling display ads, or perform field work, to which the Defendant replied, "we have no other position in our sales department, available at this time".

78.   The statement told to Plaintiff by Defendant, that "we have no other positions in our sales department, available at this time", was false, as the Defendant had at least two positions available within its sales department as of December 11, 2003.

79.   On or about November 20, 2003, the Defendant advertised, via the internet, job listing for "print advertising sales" within its sales department.  This listing was to expire January 19, 2004.

80.   On or about November 22, 2003, the Defendant advertised, via the internet, a job listing for "advertising sales" within its sales department.  This listing specifically called for responsibilities in the field of advertising, as well as marketing and public relations.  This listing was to expire January 21, 2004.

81.   At the time the Defendant told the Plaintiff of no vacancies within its sales department, on December 11, 2003, it had not filled the "print advertising sales" position, nor had it filled the "advertising sales position"

82.   At the time the Defendant told Plaintiff of no vacancies in its sales department, it knew of the two positions that it had advertised three weeks prior.

83.   At the time the Defendant told Plaintiff of no vacancies in its sales department, it
      knew of the Plaintiff's solid performance record with the company.

84.   At the time the Defendant told Plaintiff of no vacancies in its sales department, it
      knew of the Plaintiff's previous work experience in recruitment advertising,
      marketing, and public relations

85.   In spite of the Defendant's knowledge of Plaintiff's work history, performance
      potential, and experience, Defendant lied to the Plaintiff about job opportunities
      within its company.

86.   In spite of the Defendant's knowledge of Plaintiff's work history, performance
      potential, and experience, Defendant lied to the Plaintiff by not informing her
      about positions that it was advertising on the internet.

87.   In spite of the Defendant's knowledge of Plaintiff's work history, performance
      potential, and experience, Defendant denied the Plaintiff the opportunity to
      resume working with the Defendant.

88.   In essence, on December 11, 2003, the Plaintiff verbally applied for another
      position within the sales department of the Defendant's company, which was
      rejected by the Defendant.

89.   Additionally, shortly after the Plaintiff's termination the Defendant decided to
      begin selling recruitment ads (a help wanted section) within its newspaper.

90.   The Defendant knew that the Plaintiff had experience in selling recruitment ads at
      the time of her hire by the Defendant, and the time of her termination.

91.   In spite of the Defendant's knowledge of Plaintiff's experience in selling
      recruitment ads, and in spite of Plaintiff's request to be given assignments other

14

than selling classified ads, the Defendant refused to consider the Plaintiff to sell recruitment ads for the newspaper.

92. When the Defendant told the Plaintiff that "we have no other position in our sales department, available at this time", it knew that it had an intention to begin selling recruitment ads within its newspaper.

93. When the Defendant told the Plaintiff that "we have no other position in our sales department, available at this time", it knew that Plaintiff had prior experience and adequate qualifications selling recruitment ads.

94. Instead of offering the Plaintiff a position selling recruitment ads within its newspaper, the Defendant chose instead to offer the position of selling recruitment ads to a Caucasian female employee who had less experience than the Plaintiff.

95. The Defendant did give the assignment of selling recruitment ads to a Caucasian female employee who had less experience than the Plaintiff.

96. The Defendant made this choice to offer and give the position of selling recruitment ads to a Caucasian female employee who had less experience than the Plaintiff, because they did not want the Plaintiff working for the Defendant on account of her race.

97. Additionally, at the time of Plaintiff's termination, there were outstanding commissions due her, on revenue generated by the Plaintiff, via the sales that she made for the partial month of December, most of which were paid for by credit card.

98.  For the month of December, the Plaintiff had a monthly sales goal in excess of
     $40,000.00, and had, by December 11, 2003, almost met her goal, generating
     revenue in excess of $30,000.00 during the first 11 days of the month of
     December.

99.  Plaintiff maintains that most of the revenue generated for the first 11 days of the
     month of December was paid to the Defendant via credit card, thus entitling her to
     a commission on those funds.

100. There were also outstanding commissions due Plaintiff, on revenue generated by
     the Plaintiff, via the sales that she made for the partial month of December, which
     were collected by the Defendant after the Plaintiff was terminated.

101. There were also outstanding commissions due Plaintiff, on revenue generated by
     her, via sales she made for future ads, and other contracted ads of 13 weeks, 26
     weeks, and 52 weeks, that had not run in the newspaper at the time of Plaintiff's
     termination, but most of which [revenue] was paid in advance by the client via
     credit-card prior to Plaintiff's termination.

102. There were also outstanding commissions due Plaintiff, on revenue generated by
     her via sales she made for future ads, and other contracted ads of 13 weeks, 26
     weeks, and 52 weeks, that had not yet run in the newspaper at the time of
     Plaintiff's termination, but the balance of which [revenue] was collected by the
     Defendant after the Plaintiff's termination.

103. There were also outstanding bonuses due Plaintiff, for selling ads in a holiday
     section of the Defendant's newspaper between December 1 and December 11,
     2003.

104. On December 11, 2003, the Defendant paid the Plaintiff $1,267.67, which was to cover her pro-rata share for the salary she earned for the first 11 days of December, with the balance to cover any commissions generated by the Plaintiff for those same 11 days of December. The Plaintiff received her final paycheck on December 15, 2003, which covered salary and commissions for November 2003.

105. As the Plaintiff had generated revenue in excess of $30,000.00 during the first 11 days of December, the Defendant has failed to pay Plaintiff commissions which she was due.

106. As the Plaintiff had generated revenue on sales of ads that had not yet run in the newspaper as of December 11, 2003, the Defendant has failed to pay Plaintiff commissions which she was due.

107. As the Defendant had also "collected" revenue on the sales of ads outlined in paragraphs 100-102 of the Complaint, after the Plaintiff was terminated, the Plaintiff is entitled to receive a commission on those "collected" funds, which the Defendant has refused to pay.

108. The Defendant had also failed to pay bonuses to the Plaintiff, which were promised to the Plaintiff for selling ads in the holiday section of the Defendant's newspaper during the month of December.

109. As a result of Defendant's failure to pay Plaintiff commissions that were due her as of December 11, 2003, the Defendant was unjustly enriched.

17

110.   As a result of Defendant's failure to pay Plaintiff commissions that on sales
procured by her, but collected after her termination, the Defendant was unjustly
enriched.

111.   Defendant has tried to assert that it owes the Plaintiff no further commission
because the revenue that Plaintiff claims she is entitled to a commission was not
"cash-in" as of December 11, 2003.

112.   The Plaintiff avers that all sales made via a credit-card were "cash-in" pursuant to
the agreement between Plaintiff and Defendant, thus entitling her to a
commission.

113.   The Plaintiff further alleges that all revenue collected after Plaintiff's termination,
on sales procured by Plaintiff during her employment, would be subject to a
commission in Plaintiff's favor.

114.   Moreover, the Plaintiff alleges that she would be entitled to commissions on **all**
sales made by her at the time of her termination, as the Defendant has followed
that practice with Caucasian sales representatives that have been terminated by
the Defendant.

115.   Plaintiff alleges that for Defendant to pay other sales representative, who have
been terminated by the Defendant, commissions on **all** sales made by the sales
representative, and not follow the practice in her case, amounts to yet another
course of disparate treatment followed by the Defendant against the Plaintiff.

116.   Further, Plaintiff alleges that the Defendant orchestrated a scheme to terminate
Plaintiff on December 11, 2003, so as to claim that her sales made for the month

of December, (and for future ads not yet run in the newspaper) were not "cash-in" at the time of her termination.

117. Plaintiff alleges that Defendant terminated Plaintiff on December 11, 2003, so as to try and avoid paying Plaintiff commissions that were due her.

118. Plaintiff alleges that the Defendant's termination of Plaintiff on December 11, 2003, so as to try and avoid paying commissions that were due her amounted to bad faith.

119. Plaintiff alleges that the Defendant's decision to terminate Plaintiff on December 11, 2003, allowed the Defendant to become unjustly enriched, as it deprived the Plaintiff to obtain commissions for sales made by her for the Defendant.

120. Plaintiff alleges that the Defendant terminated Plaintiff in order to avoid its' obligation in paying the Plaintiff commissions that she earned, through services that she already rendered to the Defendant.

121. Plaintiff alleges that the Defendant terminated Plaintiff in order to avoid its' obligation in paying the Plaintiff commissions that she almost earned, on revenue collected by the Defendant after Plaintiff's termination, through services that she already rendered to the Defendant.

122. Additionally, Plaintiff was entitled, pursuant to the agreement with her employer, that she would be entitled to payment of unused vacation time.

123. The Plaintiff had accrued approximately 8 days of vacation time from April 3, 2002, to December 11, 2003.

124. As of December 11, 2003, the Plaintiff took full vacation days on August 29, September 7, November 26, and November 8, 2003. Plaintiff also took half-days

of vacation on November 13, and November 25, 2003. Plaintiff also took 2 hours of vacation on October 10, 2003.

125. As of December 11, 2003, the Plaintiff had used approximately five days and two hours to be applied against the 8 days of vacation time that she had accrued up to the date of her termination, leaving approximately 2 days and 6 hours of vacation time that Plaintiff is entitled to compensation.

126. Defendant refused to compensate Plaintiff for her unused vacation time.

127. Further, on December 3, 2003, the Plaintiff applied to the Defendant's 401 K plan. The Plaintiff specifically left the application with Mr. Rick Stoehrer, the person who administers the plan for the Defendant.

128. Plaintiff's understanding was that after the application was processed, the first contribution to the plan was to be deducted from the next paycheck she would receive, which in the present instance would have been on December 15, 2003.

129. After the Defendant terminated the Plaintiff on December 11, 2003, the Defendant gave the Plaintiff one paycheck for payment for services rendered in the month of December on December 11, 2003.

130. The Defendant gave the Plaintiff another paycheck for payment for services rendered in the month of November on December 15, 2003.

131. As a result of the Defendant's actions, the Plaintiff was unable to take advantage of the 401K plan offered by the Defendant.

132. After the Plaintiff's termination by the Defendant, the Defendant filled the positions that were advertised by the internet for "print advertising sales" and "advertising sales".

133. After the Plaintiff's termination by the Defendant, the Defendant filled the positions that were advertised via the internet for "print advertising sales" and "advertising sales" with persons of Caucasian descent.

134. After the Plaintiff's termination by the Defendant, the Defendant filled the positions that were advertised via the internet for "print advertising sales" and advertising sales" with person of Caucasian descent, who were either equal to Plaintiff, or less than Plaintiff, in terms of qualifications.

135. After the Plaintiff's termination by the Defendant, and after Plaintiff specifically expressed a desire to remain employed selling ads for the Defendant in its sales department, the Defendant offered the opportunity to sell recruitment ads to a person of Caucasian descent, a person who had less experience than Plaintiff in selling recruitment ads.

136. On December 16, 2004, the Plaintiff filed an action for discrimination against the Massachusetts Commission against Discrimination.

137. As a direct proximate result of the Defendant's denial of Plaintiff's commissions and bonuses that she was due at the time of her termination, Plaintiff has been caused to suffer great pain in body and mind, has been damaged professionally, has been prevented from transacting her business, and has been otherwise damaged.

138. As a direct and proximate result of the Defendant's denial of Plaintiff's commissions on collected revenue after her termination, Plaintiff has been caused to suffer great pain in body and mind, has been damaged professionally, has been prevented from transacting her business, and has been otherwise damaged.

139.  As a direct proximate result of the Defendant's failure to pay Plaintiff for all
      accrued vacation time at her termination, caused Plaintiff to suffer great pain in
      body and mind, and has been prevented from transacting her business, and has
      been otherwise damaged.

140.  As a direct proximate result of the Defendant's failure to deny her verbal
      application for other sales positions within the company, the Plaintiff was caused
      to suffer great pain in body and mind, and has been prevented from transacting
      her business, and has been otherwise damaged.

141.  As a direct proximate result of the false information that Defendant told Plaintiff,
      that they had no open positions within their sales department, caused Plaintiff to
      forgo submitting a written application to the Defendant to fill any open positions,
      and caused her to be denied an opportunity to resume her employment with the
      Defendant.

142.  As a direct proximate result of Defendant's denial of an opportunity to Plaintiff to
      resume her employment with the Defendant, caused Plaintiff to suffer great pain
      in body and mind, and has been prevented from transacting her business, and has
      been otherwise damaged.

143.  As a direct proximate result of the Defendant's hire of two white employees to fill
      the positions that a employee like Plaintiff was qualified for, and verbally applied
      for, caused Plaintiff to suffer great pain in body and mind, and has been prevented
      from transacting her business, and has been otherwise damaged.

144.  As a direct proximate result of the Defendant's failure to include Plaintiff in the
      "spiffs", that were granted to other white sales representatives, caused Plaintiff to

suffer great pain in body and mind, and has been prevented from transacting her

business, and has been otherwise damaged.

145.    As a direct proximate result of the Defendant's failure to distribute a fair share of

call-ins to the Plaintiff, rather to show a bias to white sales representatives, by

giving them a disproportionately greater amount of call-ins, caused Plaintiff to

suffer great pain in body and mind, and has prevented her from transacting her

business, and has been otherwise damaged.

146.    Plaintiff interpreted this Defendant's actions towards Plaintiff to be a measure of

Defendant's antipathy towards her because she was a person of color.

147.    The Defendant had a policy that its employees could meet with management in

order to attempt to eliminate interpersonal difficulties and to improve job

performance and promote harmony between supervisor and supervisee.

148.    In keeping with this policy, Plaintiff has met with supervisory officials employed

by the Defendant during her employment to protest against bias and disparate

treatment she received in relation to white sales representatives, all the while

placing the Defendant on notice as to their discriminatory practices.

149.    The Defendant has either refused or failed to address her concerns so as to remedy

the discriminatory practices applied against him throughout her employment, in

violation of company policy.

150.    As a direct and proximate result of the discriminatory treatment described above,

to which the Defendant's supervisors and other personnel subjected Plaintiff, and

of the separate impact of alleged facially neutral employment practices and

policies, above described, Plaintiff was harmed physically, emotionally, professionally, and financially.

151.    The discriminatory practices described above, are not job related and are not necessary for the transaction of the business of the Defendant.

152.    All conditions precedent to the filing of this action have occurred and/or have been fulfilled.

**153.**    The reasons offered by defendant for any action taken against the Defendant are a pretext for discrimination.

### CLAIMS FOR RELIEF

### COUNT 1:

### EMPLOYMENT DISCRIMINATION – WRONGFUL TERMINATION, DISPARATE TREATMENT and ADVERSE EMPLOYMENT ACTION IN VIOLATION OF MASS GEN. LAWS. CHAP. 151B

**162.**    Plaintiff repeats and re-avers all of the averments of paragraphs 1 through 161 with the same force and effect as if fully set forth herein.

163.    Defendant is an "employer" within the meaning of Mass.Gen.L. c. 151B, § 1(5).

164.    Plaintiff is an "employee" within the meaning of Mass.Gen.L. c. 151B, § 1(6), and a racial minority within the meaning of Mass.Gen.L. c. 151B.

165.    Defendant violated plaintiff's rights secured by G.L. c.151B §4, by the Defendant's disparate treatment, taken against the Plaintiff as described in the aforementioned paragraphs, said actions causing damage to Plaintiff's body, and mind, as well as preventing her from transacting her business, and has otherwise caused her damage.

166.   Defendant violated plaintiff's rights secured by G.L. c.151B §4, by the

Defendant's adverse actions, taken against Plaintiff's status of employment, as

described in the aforementioned paragraphs, said actions causing damage to

Plaintiff's body, and mind, as well as preventing her from transacting her

business, and has otherwise caused her damage.

167.   Defendant violated plaintiff's rights secured by G.L. c.151B §4, by the

Defendant's actions, in rejecting Plaintiff, who was a qualified applicant, seeking

a sales position within the Defendant's company, rather continuing their

solicitation of applicants, and hiring persons with less qualifications than the

Plaintiff, as described in the aforementioned paragraphs, said actions causing

damage to Plaintiff's body, and mind, as well as preventing her from transacting

her business, and has otherwise caused her damage.

168.   Defendant violated plaintiff's rights secured by G.L. c.151B §4, by the

Defendant's actions, in refusing to consider Plaintiff, who was a qualified

applicant, seeking to sell recruitment ads within the Defendant's company, rather

offering the opportunity to sell recruitment ads to a person with less experience

and qualification than Plaintiff, as described in the aforementioned paragraphs,

said actions causing damage to Plaintiff's body, and mind, as well as preventing

her from transacting her business, and has otherwise caused her damage.


## COUNT 2:

## BREACH OF CONTRACT -- COMMISSIONS


25

169.  Plaintiff repeats and re-avers all of the averments of paragraphs 1 through 168 with the same force and effect as if fully set forth herein.

170.  During the course of Plaintiff's employ with Defendant, Defendant promised her that in exchange for her employment, she would be paid a 10% commission on **all collected** sales procured by her over $17,110.00, and 15% over $25,000.00.

171.  There was nothing in the agreement that limited the term "collected" sales to sales that were collected while Plaintiff was still employed with the Defendant.

172.  The verbal and written promises exchanged between the Plaintiff and Defendant, as it related to how Plaintiff would be paid a commission amounted to a binding contract between the parties.

173.  Between December 1, 2003, and December 11, 2003, Plaintiff procured sales in excess of $30,000.00, most of which was paid by credit card, and collected by the Defendant.

174.  Also Plaintiff procured sales for future ads, paid for by credit-card, which were collected by the Defendant, which had not yet run in the newspaper at the time of her termination.

175.  Further Plaintiff procured sales for ads whose revenue was collected by the Defendant after the Plaintiff was terminated.

176.  Defendant never paid the Plaintiff the full amount of the commission owed to her for sales procured between December 1, 2003 and December 11, 2003.

177.  Defendant never paid the Plaintiff the full amount of the commission owed to her for her procured sales for the future ads.

26

178.    Defendant never paid the Plaintiff the full amount of the commission owed to her for her procured sales, whose revenue was collected by the Defendant after she was terminated.

179.    Defendant breached the terms of the agreement of the contract it had with the Plaintiff, in that they refused to pay commissions due her on sales procured and collected revenue between December 1, 2003 and December 11, 2003.

180.    Defendant breached the terms of the agreement of the contract it had with the Plaintiff, in that they refused to pay commissions due her for sales on future ads, that were collected by the Defendant before and after she was terminated.

181.    Said breaches have harmed the Plaintiff professionally, has prevented the Plaintiff from transacting her business, has caused her financial damage, and has damaged her otherwise.

## COUNT 3:

## BREACH OF CONTRACT -- BONUSES

182.    Plaintiff repeats and re-avers all of the averments of paragraphs 1 through 181 with the same force and effect as if fully set forth herein.

183.    During the course of Plaintiff's employ with Defendant, Defendant promised her that in exchange for her employment, she would be paid a bonus for her performance on selling ads within the holiday section of the Defendant's newspaper between December 1 and December 11, 2003.

184.    The promises exchanged between the Plaintiff and Defendant amounted to a binding contract between the parties.

27

185. Between December 1, 2003, and December 11, 2003, Plaintiff performed her work, selling ads within the holiday section of the Defendant's newspaper to a level which entitled her to a bonus as promised to the Plaintiff for her effort.

186. Defendant never paid the Plaintiff the bonus owed to her for her performance selling holiday ads December 1, 2003 and December 11, 2003.

187. Defendant breached the terms of the agreement of the contract it had with the Plaintiff, by not paying the Plaintiff the bonus owed to her.

**188.** Said breach has harmed the Plaintiff professionally, has prevented the Plaintiff from transacting her business, has caused her financial damage, and has damaged her otherwise.

### COUNT 4:

### BREACH OF CONTRACT – VACATION TIME

189. Plaintiff repeats and re-avers all of the averments of paragraphs 1 through 188 with the same force and effect as if fully set forth herein.

190. During the course of Plaintiff's employ with Defendant, Defendant promised her that in exchange for her employment, she would accrue vacation time at the rate of .4 days a month, and that she would be entitled to receive the vacation pay should her employment with the Defendant cease.

191. The promises exchanged between the Plaintiff and Defendant amounted to a binding contract between the parties.

192. Between April 3, 2002, and December 11, 2003, Plaintiff accrued approximately 8 days in vacation time.

193.   Between April 3, 2002, and December 11, 2003, Plaintiff used approximately 5 days, and 2 hours worth of accrued vacation time.

194.   The Defendant owes the Plaintiff approximately 2 days and 6 hours worth of vacation time, which the Defendant has refused to pay.

195.   Defendant's refusal to pay Plaintiff for unused vacation time is a breach of the agreement it had with the Plaintiff regarding unused vacation time.

196.   Said breach has harmed the Plaintiff professionally, has prevented the Plaintiff from transacting his business, has caused her financial damage, and has damaged her otherwise.

<u>COUNT 5:</u>

## <u>BREACH OF CONTRACT- MONEY HAD AND RECEIVED, THE DEFENDANT'S UNJUST ENRICHMENT</u>

197.   Plaintiff repeats and re-avers all of the averments of paragraphs 1 through 204 with  the same force and effect as if fully set forth herein.

198.   The Plaintiff's employment at-will with the Defendant carried with it an agreement that Defendant would pay Plaintiff a commission on all revenue regarding sales made by the Plaintiff, and collected by the Defendant.

199.   The Plaintiff's employment at-will with the Defendant carried with it an agreement that should the Defendant collect revenue regarding sales made by the Plaintiff during her employment, but collected after she was terminated, then equity and good conscience would require that Defendant pay the Plaintiff a commission on said revenue.

200. For the Defendant to retain a commission owed to the Plaintiff, in connection with any sale made by the Plaintiff during her employment, would unjustly enrich the Defendant to the detriment of the Plaintiff.

201. After the Defendant's termination of the Plaintiff on December 11, 2003, it has retained commissions owed to the Plaintiff, regarding sales she made during her employment, and has been unjustly enriched to the detriment of the Plaintiff, and constitutes breach of contract.

202. Said breach has harmed the Plaintiff professionally, has prevented the Plaintiff from transacting her business, has caused her financial damage, and has damaged her otherwise.

## COUNT 6:

## BREACH OF CONTRACT- VIOLATION OF THE IMPLED COVENANT OF GOOD FAITH AND FAIR DEALING

203. Plaintiff repeats and re-avers all of the averments of paragraphs 1 through 210 with the same force and effect as if fully set forth herein.

204. The Plaintiff's employment at will with the Defendant carried with it an implied covenant of good faith and fair dealing, which promised the Plaintiff that she would not be terminated in order to avoid payment of compensation earned by her through services already rendered to the employer.

205. The Plaintiff's employment at will with the Defendant carried with it an implied covenant of good faith and fair dealing, which promised the Plaintiff that she would not be terminated in order to avoid payment of compensation almost earned by her through services already rendered to the employer.

30

206.    The termination of the Plaintiff's employment for the reasons described in paragraphs 212 and 213, amounts to a termination in bad-faith, and a breach of contract.

207.    The Defendant's termination of Plaintiff on December 11, 2003, was made in bad faith as it was done in order to avoid payment of compensation either earned by her, or almost earned by her through services already rendered to the employer.

208.    The Defendant's termination of Plaintiff on December 11, 2003, caused the Defendant to become unjustly enriched.

209.    The Defendant's termination of Plaintiff on December 11, 2003, is a violation of the implied covenant of good faith and fair dealing, and is a breach of contract.

210.    Said breach has harmed the Plaintiff professionally, has prevented the Plaintiff from transacting her business, has caused her financial damage, and has damaged her otherwise.

WHEREFORE, plaintiff prays that this Court:

1.    Award compensatory damages to plaintiff;

2.    Award punitive damages against defendant;

3.    Award Plaintiff all outstanding commissions owed to her;

4.    Award Plaintiff all outstanding bonuses owed to her;

5.    Award Plaintiff all back-pay, and front-pay.

6.    Award costs and reasonable attorney's fees; and

7.    Grant such other and further relief which may be appropriate and/or necessary.

**PLAINTIFF DEMANDS TRIAL BY JURY**

ANNETTE HARDING,
By her attorney,

Gordon W. Spencer, Esq.
1256 Park Street, Suite 104
Stoughton, MA 02072
(781) 297-9293

Dated: September 29, 2005

32